659 F.2d 1259
 26 Fair Empl.Prac.Cas. 1329, 63 A.L.R.Fed. 339,
27 Empl. Prac. Dec. P 32,124
 INTERNATIONAL WOODWORKERS OF AMERICA, AFL-CIO, CLC; Local
5-346, International Woodworkers of America,
AFL-CIO, CLC; Richard T. Truitt;
Florence Bennett; and Harriet
P. Dennis, Appellants,
v.
CHESAPEAKE BAY PLYWOOD CORPORATION, a Division of Champion
International, Appellee.
 No. 80-1162.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1980.
Decided Sept. 17, 1981.
 
 James E. Youngdahl, Little Rock, Ark. (Liza S. Hirsch, Youngdahl & Larrison, Little Rock, Ark., Kenneth L. Johnson, Baltimore, Md., on brief), for appellants.
 Peter W. Tredick, Washington, D. C. (John J. Ross, Craig H. Ulman, Hogan & Hartson, Washington, D. C., H. Thomas Howell, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.
 Before WINTER, SPROUSE and ERVIN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an appeal by the plaintiffs from summary judgment against them on their claims of employment discrimination. The International Woodworkers of America, its affiliate Local 5-346, Richard T. Truitt, Florence Bennett, and Harriet P. Dennis filed this action against the Chesapeake Bay Plywood Corporation (Chesapeake Bay) under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.[1] Plaintiffs sued individually and as representatives of all blacks and females who are or have been victims of Chesapeake Bay's alleged race- and sex-based discriminatory employment practices.
 
 
 2
 The district court, on the basis of the pleadings and discovery material, but without a hearing, denied class certification. It also held that the Union lacked standing under Article III of the United States Constitution to litigate the employment discrimination claims of its members. The court disqualified James E. Youngdahl, one of plaintiffs' attorneys, from participation in the trial of the case when it became evident that he "ought to testify" on behalf of his client the plaintiff Union. Finally the court entered summary judgment in favor of Chesapeake Bay, finding that there was no genuine issue of material fact respecting any of the individual plaintiffs' claims of employment discrimination. Plaintiffs urge as error each of these rulings.
 
 I. FACTS
 
 3
 On May 29, 1975, the plaintiffs filed a charge of discrimination against Chesapeake Bay with the Equal Employment Opportunity Commission (EEOC). The charge asserted in general terms that Chesapeake Bay discriminated against blacks and women and that the higher paying, more desirable jobs, including supervisory positions, were disproportionately occupied by white males. Three years later the EEOC found reasonable cause to believe the charge was true.[2] Administrative reconciliation efforts failed, and this suit was filed.
 
 
 4
 The complaint alleges that Chesapeake Bay discriminates against blacks and women in hiring, job assignments, promotions, transfers, training programs, discipline, and general work conditions. The company's alleged discriminatory practices are said to have resulted in the concentration of white males in certain job categories and blacks and females in other job categories, creating substantial race- and sex-based pay differentials in the work force. Chesapeake Bay filed a counterclaim against the Union, alleging that the Union had breached the collective bargaining agreement by filing this lawsuit instead of submitting the dispute to the agreement's grievance procedure.
 
 
 5
 As the case was resolved below at the summary judgment stage, the record before us consists only of the pleadings, depositions, and an affidavit presented by Chesapeake Bay. Construing the facts in the light most favorable to the plaintiffs in reviewing summary judgment against them, the record reflects the following:[3]
 
 
 6
 Chesapeake Bay Plywood Corporation operates a plywood manufacturing plant in Pokomoke City, Maryland, which employs approximately 125 persons in its production, maintenance, and shipping departments. Approximately sixty-seven percent of its employees are black (men and women) and about sixteen percent are women (black and white). The three individual plaintiffs, one white male and two black women, are all officers of the Woodworkers Local 5-346.
 
 
 7
 Plaintiffs by depositions allege in detail: that Chesapeake Bay discriminates on the basis of race in filling maintenance jobs and supervisory positions; that the company's better paying positions are held almost exclusively by white males; that practically all supervisory personnel and foremen are white although the plant is about two-thirds black; and that an employee's initial assignment, after hiring, is made on the basis of his or her sex or race. Statistics were furnished to the court which purport to show a significantly disproportionate concentration of blacks and women in less desirable job categories.[4] These statistics indicate that the average wages of blacks and women hired each year from 1966 through 1977 were lower at hiring and have since remained significantly lower than the average wages of white males hired during each of the same years. In addition, according to these statistics, blacks and women in each represented job category receive substantially less pay than white males employed in the same job category.
 
 
 8
 The three individual plaintiffs each detailed several incidents in which women and blacks allegedly suffered injury as a result of the discriminatory practices asserted in the complaint. Plaintiffs particularized their claims during discovery as follows:
 
 
 9
 Hiring.
 
 
 10
 Qualified black applicants allegedly were passed over in favor of later white applicants. Paul Collins, for example, a qualified black male, had had an application for employment on file for several weeks when white male Ernest Malone was hired. Malone was hired the day he filed his application. The day after the hiring of Malone, Collins was hired into the same department. Yet Malone, as a result of the alleged discriminatory treatment, is now permanently ahead of Collins on the seniority list.
 
 
 11
 Initial Assignment After Hiring.
 
 
 12
 Plaintiffs maintained in their depositions that newly hired blacks and females are automatically considered for a narrower range of entry-level job assignments than are white male applicants. Black women, it is claimed, are consistently assigned to the dryer department without consideration for other more desirable jobs. This practice contributes to substantial disparities between the pay levels of white males and those of blacks and women. Plaintiff Dennis claimed to have been victimized by this practice.
 
 
 13
 Discipline.
 
 
 14
 According to the deposition testimony, harsher disciplinary measures are consistently meted out to blacks and women than would be imposed upon white male employees for similar offenses. Read as a whole, the depositions suggest a pattern. Black female plaintiff Dennis, for instance, testified during her deposition that she received a written warning for the offense of failing to immediately report an injury received on the job. She claims this disciplinary action is harsher than that a white male would have received. She stated that white male Norwood Burte, for example, committed the identical offense but received only an oral reprimand.
 
 
 15
 Black male William Sledge, a nine-year employee with no previous unexcused absences, was discharged for the offense of failing to report to work even though the collective bargaining agreement called for three unexcused absences before the imposition of discharge. Sledge was eventually rehired, but without restoration of his seniority. Richard T. Truitt, President of the plaintiff Local, stated that Sledge was accorded such unusually severe treatment because Sledge is black. To illustrate the company's comparatively lenient treatment of white male employees guilty of similar work-rule infractions, Truitt cited the case of Aldren Adkins, a white male, who, having walked off the job after a dispute with a supervisor, was rehired with full restoration of seniority.
 
 
 16
 Other incidents of discrimination in discipline emerged during discovery. Annie Byrd's pay was "docked" for her arriving at work fifteen minutes late. A white male who had arrived even later than Ms. Byrd, however, received pay for the whole day. Blacks were disciplined for intoxication on the job, but whites in the maintenance department allegedly were permitted to escape discipline for this offense. Richard Truitt testified that because of their race Eugene Epps and George Brights, both black males, were given "final written warnings" instead of "first warnings" for their first work offenses. Established practice, Truitt said, calls for "first warnings" for an employee's first offense.
 
 
 17
 Promotions and Transfers.
 
 
 18
 Blacks, according to the deposition testimony, are excluded from the maintenance and shipping departments and from supervisory positions.
 
 
 19
 There are no written or objective criteria for promotion to supervision. Vacancies for foreman and lead man positions are not required under the collective bargaining agreement to be posted. Vacancies are made known solely by word of mouth. Employees currently holding foreman and lead man jobs testified that they had not applied for them, but instead had been casually approached by management and informed orally of the vacancy. There are no black foremen.
 
 
 20
 Although the plant apparently had only three lead man positions in 1977, this job was described as an important conduit to higher supervisory positions. Qualified blacks William Low and George Brights applied for available lead man jobs, but were passed over in favor of white male applicants.[5]
 
 
 21
 Blacks allegedly have been excluded from the relatively well paying, highly desirable maintenance department because of racial considerations. Although the collective bargaining agreement requires vacancies in the maintenance department to be posted for bidding, frequently such vacancies were not posted. Numerous qualified black males including Tom Riley, Eugene Taylor, Benny Coleman, Daniel Melindez, and Gilbert Cutler have long sought positions in the maintenance department. Openings almost invariably are filled by white males, often, it was charged, by a relative, friend, or neighbor of the white maintenance superintendent. Only two of the twenty-two employees in the maintenance department are black.
 
 
 22
 The company has a maintenance training program. This was a product of the 1976 collective bargaining sessions; it was instituted to ameliorate racial imbalance in the maintenance department. Plaintiffs claim, however, that the maintenance training program is being ignored or is being used to perpetuate the exclusion of blacks from the maintenance department. Truitt testified that an employee who fails to complete the program is not reassigned to his former job, but instead is placed in the labor pool at the base rate on the bottom job. This practice discourages employees from entering the training program as a vehicle for moving into maintenance jobs. The practice is said to have a disparate impact on blacks. It was asserted that the maintenance training program existed "on paper" only and "in fact is not used." The company would hire white employees "off the street" for available maintenance jobs rather than putting black employees through the training program. Black employees would be initially hired with the understanding they would receive training for entry into maintenance positions; yet, as in the case related by Dennis and Truitt of Jimmy Allen, the training would never materialize.
 
 
 23
 Occasionally, blacks and women are transferred or promoted to better positions, but, because of race or sex, are allegedly forced out of the newly gained position. Plaintiffs testified that supervisors would give a newly promoted black or female employee extra work or otherwise so harass him or her at the new job that the employee would be unable to keep it. Black male Gilbert Cutler, for instance, held a maintenance job for a brief period but, according to deposition testimony, was not given sufficient time to learn the job before supervisors began "harassing" him about poor job performance. Myrtle Mills, a black woman, was given a job as a dryer tender but she was unable to keep it because "she couldn't get no cooperation from anybody to help her pull the vats out." Males on this job routinely required and were given assistance with this difficult step of the operation "but they wanted (Myrtle) to do it by herself."
 
 
 24
 Dennis and Truitt claimed that women are excluded from permanent positions in the presumably desirable spreader department. They recounted the situation of Carol Bivens, a black female. Bivens was apparently the first woman to be granted an opportunity for a spreader position. During her 90-day, probationary training period, Bivens received a work injury and was removed from her new job. There is no suggestion that her injury rendered her permanently unfit for a spreader job. She had been progressing satisfactorily during her probation period and, from all that appears, she was well qualified for the position.[6] Plaintiffs assert that the sole reason she lost the spreader job was her sex. According to Dennis, spreader foreman Mike Soulis said that he "just don't want any women working on the spreader."
 
 
 25
 General Work Conditions.
 
 
 26
 It is alleged that blacks are routinely assigned to "harder, dirtier, and more onerous jobs" than are white employees. Truitt stated that blacks are asked to do dirtier work such as cleaning out ditches and digging up stopped-up pipes than are white employees.
 
 
 27
 The two black female plaintiffs testified that due to their race and sex they had been subjected to harassment and more onerous work conditions than were white males. Bennett, unlike white male employee David Jester, was not permitted to drink coffee at the beginning of her shift. Dennis claims that her supervisor discriminated against her because of her race and sex in requiring her to find a replacement before she could take a Saturday off; white male employees need not obtain their own replacements for days off. Dennis also claims that, because of her race and sex, her job was improperly posted as open when she was on medical leave. Bennett alleges that in 1969 or 1970 she was permitted to go to the bathroom only during breaks; this, she contends, was unlawful discrimination, as a white woman was allowed to leave her work station whenever she wished to go to the bathroom. Finally, Bennett claims that in 1971 her supervisor discriminated against her by consistently assigning easier work tasks to her white coworker.
 
 
 28
 Having persuaded the district court that the Union lacked standing to proceed on behalf of its members and that class certification was inappropriate, Chesapeake Bay in seeking summary judgment presented evidence addressing only a few of the individual discrimination claims. It submitted the affidavit of Tom O'Bryant, the company's Regional Manager for Equal Opportunity Affairs. In response to Bennett's claim of discrimination in the allowance of coffee breaks, O'Bryant claimed the disparity was attributable to the assignment of the involved employees to different departments with different work schedules. According to the affidavit, shipping department employee David Jester's work duties often take him to the supervisors' office in Bennett's work area. His drinking coffee there is consistent with the schedule in the shipping department. As a production line employee, Bennett did not work under a schedule that would accommodate such coffee breaks.
 
 
 29
 Chesapeake Bay's affidavit briefly addresses Dennis's claim of discrimination in having, unlike her white coworkers, to find her own replacement before she could take a Saturday off work. O'Bryant admits that "under the correct procedure the foreman is responsible for trying to find replacements in such situations." No further explanation for this instance of alleged sex and race discrimination appears in the record.
 
 
 30
 Rather than controverting Dennis's assertion that she had been a victim of discriminatory discipline for failure to immediately report an injury, O'Bryant's affidavit simply states that a white employee who was not disciplined committed no disciplinable offense. Thus the affidavit states, contrary to Dennis's version, that Norwood Burte in fact did report his work injury the day it occurred.
 
 
 31
 Chesapeake Bay also presented evidence that Dennis's assignment to a position in the dryer department was at her own request.
 
 
 32
 Defendants urged that Bennett's individual claims of disparate treatment in bathroom privileges and in the distribution of easier tasks were time-barred. Finally, dismissal was urged as to Truitt because he is a white male and did not claim to have been a victim of discrimination.
 
 II. THE DISTRICT COURT'S RULINGS
 
 33
 The district court's first ruling was its denial of plaintiffs' motion to certify the proposed class. This was by a brief letter to counsel stating without explanation that the court was "satisfied that the plaintiffs do not meet the requirements of Rule 23, Federal Rules of Civil Procedure, in several basic areas." Some three months later the court granted partial summary judgment to Chesapeake Bay dismissing the claims of the Union on the ground that it lacked standing and those of Truitt for his failure to allege any actionable injury. At the same time the court granted Chesapeake Bay's motion to disqualify the plaintiffs' lead attorney. Some five months later the court entered summary judgment against the two remaining plaintiffs, Bennett and Dennis, concluding that some of their claims were time-barred, that others failed because, in the court's view, plaintiffs had not brought forth sufficient facts to state viable employment discrimination claims, and, as to the remaining claims, that the discovery material revealed no genuine issues for trial and hence no liability on the part of Chesapeake Bay.
 
 
 34
 In light of its rulings on standing and class certification, the court did not address the merits of the following claims, as developed during discovery:
 
 
 35
 the claim that prior qualified black applicants for employment are passed over in favor of later white applicants;
 
 
 36
 the claim that newly hired black females are automatically considered for a narrower range of entry-level assignments than are new white male employees;[7]
 
 
 37
 the claim that a pattern of discriminatory discipline exists in that black employees are routinely dealt harsher disciplinary measures than are white employees;[8]
 
 
 38
 the claim that Chesapeake Bay discriminates against blacks in the filling through promotions, transfers, and otherwise of maintenance positions, foreman, lead man and other supervisory positions;
 
 
 39
 the claim that the maintenance training program is being conducted in a manner that discriminates against blacks;
 
 
 40
 the claim that black or female employees who did receive promotions or transfers would be so harassed, because of their race or sex, that they would be unable to retain their new positions;
 
 
 41
 the claim that, because of their race and sex, black and female employees are subjected to more onerous work conditions and receive more difficult, dirtier work assignments than do white males;[9] and
 
 
 42
 the claim that, as a result of the defendant's allegedly discriminatory practices, substantial disparities exist between the pay levels of white males and those of blacks and women.
 
 III. THE UNION'S ARTICLE III STANDING
 
 43
 The Union, of course, does not assert any injury to itself as an entity. It raises only the claims of its members. This, however, does not preclude standing under Article III of the Constitution.
 
 
 44
 Even in the absence of injury to itself, an association may have standing solely as the representative of its members .... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.
 
 
 45
 Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1974). See Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).[10]
 
 
 46
 The district court recognized that under Warth v. Seldin the Union as an association normally would have standing under Article III of the Constitution to seek prospective judicial relief on behalf of its members. The court, however, assigned two reasons, neither having validity in this case, for denying the Union standing: that "there is no bar to employees bringing actions ..." and "(m)ore importantly, (that) the interests of the labor union are not identical to those of an individual worker."
 
 
 47
 It is not fatal to the standing of an organization that its members might be in a position to litigate their own claims. "(S)o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause," the organization may vindicate its members' justiciable claims. Warth v. Seldin, 422 U.S. at 511, 95 S.Ct. at 2211 (emphasis added). See Harris v. McRae, 448 U.S. 297, 317-321, 100 S.Ct. 2671, 2688-2690, 65 L.Ed.2d 784 (1980); Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The relevant inquiry for present purposes is not merely whether circumstances permit members of the association to individually vindicate their own rights, but rather is whether the claims asserted or the relief requested requires each member to participate individually in the lawsuit.
 
 
 48
 The district court also reasoned that since Chesapeake Bay had filed a counterclaim against the Union, the Union's interests were not identical with those of its members. Chesapeake Bay's counterclaim, however, does not create the kind of conflict that could defeat the Union's standing.[11] The counterclaim fails to allege any discriminatory acts or conduct for which the Union might be liable. It is based solely on the Union's alleged duty to resolve charges of discrimination by grievance and arbitration. It is essentially a claim for breach of the contract between Chesapeake Bay and the Union. Nowhere is there any assertion that the Union participated or acquiesced in discriminatory conduct in contract negotiations, grievance resolution, or otherwise. There is no suggestion that the provisions of the collective bargaining agreement are themselves discriminatory. The counterclaim prays that the Union be held jointly liable for any judgment entered against Chesapeake Bay, but there are no allegations and no evidence on the present record upon which such relief could be based.[12]
 
 
 49
 We conclude that the Union has made out a "case or controversy" sufficient to satisfy Article III.
 
 IV. CLASS CERTIFICATION
 A. The Need to Develop the Record
 
 50
 The district court acted prematurely in denying class certification with its brief letter to counsel.
 
 Rule 23(a), Fed.R.Civ.P. provides:
 
 51
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 52
 The burden of establishing the requirements of Rule 23 rests, of course, with the party seeking certification. We discussed in some detail a district court's duty in determining whether that burden has been met in Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267 (4th Cir. 1980). We have often emphasized the value of specific findings on the factors enumerated in Rule 23, Shelton v. Pargo, Inc., 582 F.2d 1298, 1312-13 (4th Cir. 1978); Doctor v. Seaboard Coast Line R. R. Co., 540 F.2d 699, 708 (4th Cir. 1976) (quoting Miller v. Mackey Int'l Inc., 452 F.2d 424, 431 (5th Cir. 1971)), and where the pleadings and discovery leave doubt as to the propriety of certification, the need for an evidentiary hearing on the question. Belcher v. Bassett Furniture Industries, Inc., 588 F.2d 904, 906 & n. 2 (4th Cir. 1978); Doctor, 540 F.2d at 708.
 
 
 53
 It is not essential to the resolution of every class certification motion that the trial court conduct a hearing, but it is essential that a plaintiff be afforded a full opportunity to develop a record containing all the facts pertaining to the suggested class and its representatives. It is seldom, if ever, possible to resolve class representation questions from the pleadings, and where facts developed during discovery proceedings are inadequate, an evidentiary hearing should be held on the request of the parties or, if necessary for a meaningful inquiry into the requisites of Rule 23, by the court sua sponte.[13]
 
 
 54
 In the instant case, the pleadings and depositions raise serious questions concerning class representation that should have been resolved by the district court after a full hearing. We cannot say on the present record that the numerous claims developed during discovery the assertions of race- and sex-based discrimination regarding initial assignments, the allegation that blacks have been excluded from the maintenance department and from supervisory positions because of their race, the allegedly discriminatory operation of the maintenance training program, the alleged pattern of discriminatory discipline, the pay disparities said to have resulted from racial and sexual discrimination are so obviously without class-wide potency as a matter of law that a hearing is not necessary. Where, as here, the written record leaves serious questions as to the propriety of class certification, an evidentiary hearing is essential. Camper v. Calumet Petrochemicals, Inc., 584 F.2d 70, 72 (5th Cir. 1978).
 
 B. The Union as a Class Representative
 
 55
 Chesapeake Bay contends that the Union cannot satisfy Rule 23(a)(3) on the ground that it is not a member of the class. It argues that an injury to a member is not an injury to the Union, and that language in East Texas Motor Freight v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977), precludes certification of a class with the Union as the representative party.[14] The fallacy of this argument is that the Union, as a class representative with standing under Article III to raise its members' claims, is seeking to redress injuries suffered by its members. Here it acts merely as a conduit for the vindication of its members' rights to be free of discrimination in their employment. Injury to the Union as an entity is not a prerequisite to the vicarious assertion of these civil rights. "There is nothing in the law which preclude(s) the Union from recognizing the injustice done to a substantial minority of its members and from moving to correct it." Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir. 1969).[15] We agree with Justice (then Circuit Judge) Blackmun that the status of an organization to proceed as a class representative should not be defeated solely because the organization is "not itself, technically, an individual member of a class." Smith v. Board of Education, 365 F.2d 770, 777 (8th Cir. 1966). See Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968).
 
 
 56
 Chesapeake Bay also argues that the Union is an inadequate class representative because of the conflicts of interest between the Union and its membership precipitated by the company's counterclaim against the Union. This is the same reasoning advanced by the district court in denying Article III standing. This contention is no more valid to block class certification than it was to deny standing. The counterclaim simply does not create the kind of conflict that would defeat commonality, typicality, or prevent this Union from adequately protecting the interests of the class.[16] Neither is Chesapeake Bay helped because the Union for purposes of this case is representing only blacks and women and not its white male members. There is no basis in the record for finding intraunion conflict at this juncture. As was said in Social Services Union, Local 535 v. County of Santa Clara, 609 F.2d 944, 948 (9th Cir. 1979), "Mere speculation as to conflicts that might develop at the remedy stage is insufficient to support denial of initial class certification." (footnote omitted). See International Woodworkers of America v. Georgia-Pacific Corp., 568 F.2d 64, 67 (8th Cir. 1977). It certainly cannot be complained that the Union is helping its members obtain rights which Congress has forcefully mandated.
 
 
 57
 C. Truitt and Bennett as Class Representatives
 
 
 58
 Truitt concedes he has not been injured by any acts of discrimination. As he obviously does not possess the same interests nor suffer the same injuries as the class members he seeks to represent, he cannot be a class representative in this case. East Texas Motor Freight v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977); Hill v. Western Elec. Co., Inc., 596 F.2d 99, 101 (4th Cir. 1979). Similarly, Bennett repeatedly admitted during her deposition that she had not been injured by any of the discriminatory practices alleged in the complaint. She also is precluded from being a class representative.
 
 D. Dennis as a Class Representative
 
 59
 The record at this stage is not sufficient to enable a final conclusion as to Dennis's status as a class representative. On the present record, however, we cannot agree with the argument that none of Dennis's claims are typical of those of the putative class. See Fed.R.Civ.P. 23(a)(3).
 
 
 60
 As the Supreme Court emphasized in Rodriguez, a class representative must "possess the same interest and suffer the same injury" as the class members she seeks to represent. 431 U.S. at 403, 97 S.Ct. at 1896. In Hill we held that the interests of employed plaintiffs in being free from discrimination in job assignments and promotions differed so markedly in kind from the interests of people who were denied employment altogether that the former could not act as class representatives of the latter. 596 F.2d at 102. We noted there, however, that "Rodriguez did not require the fractionization of similar claims by a class of employees in a single facility...." Id. See Russell v. American Tobacco Co., 528 F.2d 357, 365 (4th Cir.), cert. denied, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 176 (1976); Barnett v. W. T. Grant Co., 518 F.2d 543 (4th Cir. 1975). Thus, while it is true that a named plaintiff may not represent persons whose injuries resulted from employment practices different in kind or origin from those to which the plaintiff was subjected, Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267 (1980), where the interests of the representative plaintiff coincide with those of the class members, Rule 23 does not require precise, mirror-image identity respecting the injuries caused by a single practice or policy at a single facility. Rodriguez did not "destroy the utility of the class action device by requiring separate suits on an episodic basis." Hill, 596 F.2d at 102. Obviously, a single, unitary policy of disparate treatment might not injure every affected person in exactly the same manner or degree. That need not preclude certification, at least not on a conditional basis. See Fed.R.Civ.P. 23(c)(1).
 
 
 61
 The complaint alleges, and deposition testimony tends to confirm, that Chesapeake Bay has a uniform policy of employment discrimination against blacks and women. The alleged discriminatory practices are interrelated and closely connected: initial assignment affects pay, training affects promotion, promotion affects pay, job harassment affects performance, which, in turn, affects promotion and pay. There is involved but a single plant. Although more than one department is affected, the practices and their discriminatory effects are said to emanate from a unitary employer policy. From all that appears on the record, the same management is directly responsible for all personnel matters at Chesapeake Bay. Subject to a qualification concerning the claims of discrimination in initial assignment, we cannot say on the present record that either the injuries allegedly suffered by Dennis or her interests in being free from job discrimination are so different from those of other blacks and women employed at the same facility that she may not represent them in a class action.
 
 
 62
 The district court correctly found that Dennis's claim of discrimination in her initial assignment was time-barred.[17] This, however, does not destroy the viability of timely initial-assignment claims of other employees the potential class members. Courts passing upon motions for class certification have generally refused to consider the impact of such affirmative defenses as the statute of limitations on the potential representative's case. See 1 H. Newberg, Class Actions § 1115e at 190 & n. .68 (1977). When a court proceeds to consider the named plaintiff's claim on the merits, however, the successful interposition of a limitations defense against her, of course, stands as the law of the case. Dennis has had her day in court on her initial assignment claim, and her own legal inability to succeed on it renders her an improper representative in further proceedings concerning this particular claim. Goodman v. Schlesinger, 584 F.2d 1325, 1332 (4th Cir. 1978); Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir. 1972). Since we hold that the district court acted prematurely in denying class certification, on remand it may permit a proper plaintiff or plaintiffs who claim discrimination in their initial assignment to present themselves to the court to pursue the claim as class representatives. Goodman, 584 F.2d at 1332-33; Cox, 471 F.2d at 15-16 (4th Cir. 1972).[18]
 
 
 63
 Should the district court on remand certify a class, such certification, of course, may be conditional, and the court may amend or modify its order at any time before decision on the merits. Fed.R.Civ.P. 23(c)(1). See Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267, 275 (4th Cir. 1980).
 
 
 64
 V. TRUITT, BENNETT AND DENNIS AS INDIVIDUAL PLAINTIFFS
 
 A. Truitt
 
 65
 The summary judgment against plaintiff Truitt is affirmed. The complaint alleges injuries to blacks and women. As a white male, Truitt could not conceivably have suffered personally the injuries alleged in the complaint. Nor does he allege that he has been retaliated against for his efforts in pursuing the civil rights claims of others. See 42 U.S.C. § 2000e-3(a). Cf. Smith v. Secretary of the Navy, 659 F.2d 1113 (D.C.Cir. Jan. 30, 1981). There is nothing to suggest a possible claim that he has been denied the benefits of interracial associations. Cf. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 111-15, 99 S.Ct. 1601, 1613-1616, 60 L.Ed.2d 66 (1979); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209-10, 93 S.Ct. 364, 366-367, 34 L.Ed.2d 415 (1972); Coleman v. Havens Realty Corp., 633 F.2d 384, 389-90 (4th Cir. 1980), cert. applied for, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1980); EEOC v. Bailey Co., 563 F.2d 439, 451-54 (6th Cir. 1977).
 
 B. Bennett and Dennis
 
 66
 We agree with the district court that certain of the claims of Bennett and Dennis are time-barred. Under Title VII, a charge must be filed with the EEOC within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e).[19] The limitations period for suit under 42 U.S.C. § 1981 is three years in Maryland. Lewis v. Bethlehem Steel Corp., 440 F.Supp. 949, 953 (D.Md.1977), citing Md.Cts. & Jud.Proc.Code Ann. § 5-101 (1975). See Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462-63, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). In this case the charge was filed with the EEOC on May 29, 1975; the complaint was filed on December 28, 1978. Thus, Title VII claims based on events prior to November 25, 1974, as well as section 1981 claims arising prior to December 29, 1975, would normally be time-barred in this case. No reason has been offered for extension. We therefore agree with the district court that Bennett's claims concerning bathroom privileges and task assignments, both of which arose during 1969 and 1970, and Dennis's claim relating to her initial assignment in 1971, are time-barred.[20]
 
 
 67
 The summary judgment against Bennett is also affirmed on the basis of general Title VII requirements. Chesapeake Bay, by affidavit, explained that any disparity in its treatment of Bennett was attributable to the assignment of the involved employees to different departments with different work schedules. Confronted with this "legitimate, nondiscriminatory reason," McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), Bennett failed to come forward with evidence challenging her employer's explanation.
 
 
 68
 In order to successfully resist a motion for summary judgment, a plaintiff in an employment discrimination case normally cannot rest on the allegations of her complaint. She must, like any plaintiff, produce evidence countering that presented by the moving party. See Atkinson v. Bass, 579 F.2d 865, 866 (4th Cir. 1978). Prior deposition testimony, of course, may satisfy her obligation under Rule 56(c), Fed.R.Civ.P., to show that there are genuine issues of material fact for trial. See Williams v. Howard Johnson's Inc. of Washington, 323 F.2d 102, 105 (4th Cir. 1963). Unfortunately for Bennett's cause, her deposition statements advanced the entry of summary judgment against her. She repeatedly denied that she had been victimized by any of the types of discrimination alleged in the complaint.
 
 
 69
 We reach a different conclusion concerning the entry of summary judgment against Dennis.
 
 
 70
 In addition to her claim concerning her initial assignment, Dennis related three other separate incidents in which she felt she had been a victim of unlawful discrimination.
 
 
 71
 The first occurred while Dennis was on temporary medical leave after she "got (her) finger amputated on the job ...." While she was on leave, management posted her job as vacant and available and she temporarily lost her job. Dennis claimed that she was treated this way solely because of her race and sex. Chesapeake Bay offered no explanation for this deviation from usual procedure. Second, Dennis claims she was discriminated against in having to find her own replacement for a Saturday off work, even though white employees are not subjected to such a requirement. She claims this disparate treatment is attributable to her race and sex. Chesapeake Bay's affidavit admitted that the supervisor who imposed this requirement upon Dennis was in error. No further explanation was offered.
 
 
 72
 The district court entered summary judgment against Dennis on her claims concerning Saturday replacements and the posting of her job on the ground that she had established no causal connection between her legally protected status and the disparate treatment. This was error. The fact that motive is often the critical issue in employment discrimination cases does not mean that summary judgment is never an appropriate vehicle for resolution. Affidavits might conceivably disclose no genuine factual issue as to the existence of a legitimate, nondiscriminatory reason for the treatment of a plaintiff. But summary judgment is seldom, if ever, proper where, as with these two claims of Dennis, discovery suggests a pattern of discriminatory, race- and sex-based harassment, no nondiscriminatory explanation has been offered by the employer, and the plaintiff's sworn, credible assertions of unlawful discrimination in the particular instance thus stand unrebutted. Dennis may well be unable to carry her "ultimate burden of persuading the court that she has been the victim of intentional discrimination." Texas Department of Community Affairs v. Burdine, --- U.S. ----, ----, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). But the district court, with only the depositions and affidavit submitted in this case, had no basis for discrediting Dennis's sworn statements detailing these two instances of perceived unlawful discrimination.
 
 
 73
 Third, Dennis claims that because of her race and sex she received unduly harsh discipline for a work offense. Deposition testimony suggests a pattern of alleged discriminatory discipline for like offenses of which Dennis's treatment is an example. Chesapeake Bay's affidavit asserts, on the contrary, that the difference in treatment was occasioned by differing circumstances. This raises a genuine issue of material fact, and the court erred in granting summary judgment against Dennis on this claim.
 
 VI. DISQUALIFICATION OF PLAINTIFFS' ATTORNEY
 
 74
 The district court's order disqualifying the plaintiffs' attorney is affirmed.
 
 
 75
 The International Union designated James E. Youngdahl, its general counsel and attorney for the plaintiffs, as the person to furnish its deposition. See Fed.R.Civ.P. 30(b)(6). Youngdahl thereafter appeared at the deposition proceeding and testified on behalf of his client the International Union. He explained his appearance:
 
 
 76
 We examined the notice of deposition and concluded that I was the only one that could give any kind of reasonable answers to these questions. I am the only one that knows anything about most of these things.
 
 
 77
 The district court decided that since Youngdahl "ought to testify on behalf of his client" the Code of Professional Responsibility (Code) required his disqualification.
 
 
 78
 Disciplinary Rule 5-102(A) of the Code provides:
 
 
 79
 If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in any of the circumstances enumerated in DR 5-101(B)(1) through (4).
 
 
 80
 Plaintiffs urge the applicability of the hardship exception of DR 5-101(B)(4), under which a lawyer may continue the representation and testifyas to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.
 
 
 81
 We think the district court's action in this case was based on a proper understanding of the applicable Code provisions. Youngdahl concedes he is the only person with sufficient knowledge to speak on the wide-ranging topics listed by Chesapeake Bay in its notice of deposition. The roles of witness and advocate are fundamentally inconsistent and when, as the district court correctly held, a lawyer ought to testify as a witness for his client, he must as a rule withdraw from advocacy.[21] It was not claimed that Youngdahl's special expertise in Title VII employment discrimination cases would be of "distinctive value ... in (this) particular case." There is likewise no factual basis to support the contention that disqualification would occasion "substantial hardship" for Youngdahl's clients.
 
 
 82
 In summary, we affirm the order of the district court disqualifying counsel, affirm the entry of judgment against plaintiffs Truitt and Bennett, reverse the judgment against the plaintiff Union and plaintiff Dennis, vacate the denial of class certification, and remand for further proceedings consistent with the views expressed herein.
 
 
 83
 AFFIRMED IN PART; REVERSED IN PART; REMANDED.
 
 
 
 [1]
 The International and the Local have a collective bargaining agreement with Chesapeake Bay and collectively are called "Union" herein
 
 
 [2]
 The EEOC determined that
 (W)hite males were hired at higher levels (of pay) than any of the other groups (blacks or women).... (M)inorities are well represented in Respondent's work force, but ... they (are) concentrated in the lower job classifications, namely, as operatives and laborers. There are no black or female officials in the company. The ... data showed that blacks and women are hired initially into lowere (sic) jobs and that they are not represented in the higher job classifications; consequently, they receive lower wages.
 
 
 [3]
 Our recitation of the factual record developed thus far is, of course, not binding in further fact-finding proceedings
 
 
 [4]
 The import and validity of these statistics matters upon which we express no opinion are not addressed in the current record. The statistics were filed after the court's denial of class certification as part of a memorandum in which plaintiffs outlined what they expected to prove at trial. Neither the data from which these statistics were derived nor the manner of their derivation appears in the record
 
 
 [5]
 The white male who was promoted to the drier department lead man position for which George Brights was qualified had, according to Truitt, "absolutely no experience" in that department
 
 
 [6]
 There is no evidence that physical strength, for example, was a bona fide occupational qualification for spreader jobs and no suggestion that Bivens' injury resulted from any physical shortcomings
 
 
 [7]
 The court did determine that Dennis's individual claim regarding her initial assignment was time-barred
 
 
 [8]
 The court did rule on the merits of Dennis's individual claim of discriminatory discipline, but it disregarded the similar claims involving other employees
 
 
 [9]
 The court ruled on the claims of Dennis and Bennett that they had been subjected to more onerous work conditions than white males, but did not rule on similar claims concerning other workers
 
 
 [10]
 The Supreme Court enumerated the requirements of associational standing in Hunt v. Washington Apple Advrtsg. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). An association may seek prospective judicial relief on behalf of its members when:
 (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claims asserted, nor the relief requested, requires the participation of the individual members in the lawsuit.
 
 
 [11]
 See Social Serv. Union, Local 535 v. County of Santa Clara, 609 F.2d 944, 946 (9th Cir. 1979); International Woodworkers of America v. Georgia-Pacific Corp., 568 F.2d 64, 66-67 (8th Cir. 1977); Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, 540 F.2d 864, 865 (7th Cir. 1976)
 
 
 [12]
 We note also that the record is devoid of any suggestion of conflict among the membership concerning either the carrying on of this lawsuit or employment discrimination issues in general. Compare Harris v. McRae, 448 U.S. 297, 317-321, 100 S.Ct. 2671, 2688-2690, 65 L.Ed.2d 784 (1980), where the Supreme Court denied associational standing to an organization challenging the Hyde Amendment. The organization in McRae had conceded the existence of a diversity of views within its membership regarding the acceptability of abortion
 
 
 [13]
 The Fifth Circuit has ruled that hearings are required on class certification motions whether requested by counsel or not. E. g., Satterwhite v. City of Greenville, 578 F.2d 987, 993 & n. 7 (5th Cir. 1978), vacated on other grounds, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980); Camper v. Calumet Petrochemicals, Inc., 584 F.2d 70, 72 (5th Cir. 1978). See 3B Moore's Federal Practice P 23.50, at 23-422 (2d ed. 1980)
 
 
 [14]
 In Rodriguez the Court stated that a named plaintiff must "possess the same interest and suffer the same injury" as the class members he purports to represent. 431 U.S. at 403, 97 S.Ct. at 1896
 
 
 [15]
 In fact it has been argued by some commentators that a union may be better suited to represent a class consisting of its members in employment discrimination litigation than the members themselves. Deinhardt, Unions as Title VII Plaintiff Class Representatives: A Potential Conflict of Roles and a Possible Solution, 1 Indus.Rel.L.J. 755 (1977); Youngdahl, Suggestions for Labor Unions Faced with Liability Under Title VII of the Civil Rights Act of 1964, 27 Ark.L.Rev. 631 (1973)
 
 
 [16]
 Cf. International Bhd. of Elec. Workers, Local 1805 v. Westinghouse Elec. Corp., 20 E.P.D. P 30,082 (D.Md.1979) (union precluded from class representation where discriminatory practices allegedly were created by collective bargaining agreement); Lynch v. Sperry Rand Corp., 62 F.R.D. 78 (S.D.N.Y.1973) (union precluded from representation where it allegedly shared responsibility for unlawful discrimination). Again we note the absence of any allegation or evidence that the Union in this case is guilty of discriminatory conduct
 
 
 [17]
 See p. 1271 infra
 
 
 [18]
 In addition, the district court upon a proper motion should consider the construction of subclasses. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 407-08, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980)
 
 
 [19]
 If a grievant first institutes state or local administrative proceedings, the charge must be filed with the EEOC within 300 days of the discriminatory act or within 30 days of the termination of state or local proceedings, whichever is earlier. 42 U.S.C. § 2000e-5(e). No state or local proceedings were initiated in this case
 
 
 [20]
 As noted earlier, p. 1270, the fact that Dennis's claim of discrimination in initial assignment is time-barred does not destroy the viability of like claims arising on or after November 25, 1974, of potential class members
 
 
 [21]
 See Ethical Consideration (EC) 5-9. "Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." EC 5-10