991 F.2d 789
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Campbell C. JOHNSON, III, Plaintiff-Appellant,
v.
STATE OF MARYLAND; Department of Economic and Employment
Development, Defendants-Appellees.
 No. 92-1808.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 3, 1993
Decided: April 20, 1993
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CA-91-1884-HAR)
 Edward Jay Tolchin, FETTMAN & TOLCHIN, for Appellant.
 Sheila McDonald Gill, Assistant Attorney General, for Appellees.
 J. Joseph Curran, Jr., Attorney General of Maryland, Marlene Trestman, Assistant Attorney General, for Appellees.
 D.Md.
 REVERSED AND REMANDED.
 Before WIDENER and LUTTIG, Circuit Judges, and VOORHEES, Chief United States District Judge for the Western District of North Carolina, sitting by designation.
 LUTTIG, Circuit Judge:
 
 OPINION
 
 1
 Campbell C. Johnson, III, appeals from an order of the federal district court for the District of Maryland granting summary judgment to appellees the state of Maryland and Maryland's Department of Economic and Employment Development in Johnson's employment discrimination suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Because we conclude that the district court impermissibly decided a number of genuine issues of material fact, we reverse.
 
 I.
 
 2
 The mission of Maryland's Department of Economic and Employment Development (DEED) is to advance the economic welfare of the state's residents. In furtherance of that mission, DEED's Division of Business Development (DBD) markets the state to business, encouraging new companies to locate in Maryland and existing businesses to remain in the state and expand their enterprises.
 
 
 3
 In 1988, on the recommendation of DBD Director James Peiffer, DEED hired appellant Johnson to be manager of DBD's Marketing Resources unit, subject to his acceptable performance during a probationary period initially scheduled to run from the day he began work, March 7, 1988, until September 7, 1988. The Marketing Resources unit (1) provides support to DBD industrial representatives in their dealings with businesses that are exploring moves to Maryland or expansion within the state; (2) maintains a business information library; (3) prepares and maintains certain DEED publications; and (4) identifies and analyzes economic opportunities available to DBD. See J.A. at 246-49; Appellees' Br. at 3. DBD Director Peiffer, who is white, was chiefly responsible for supervising Johnson, who is black.
 
 
 4
 After appellant had been in the position for several months, Peiffer concluded that his performance as a manager was deficient "because the Marketing Resources unit [had] failed to produce satisfactory work in any of the four areas that are the unit's primary areas of responsibility" and because Johnson had "failed to develop an effective working relationship with his professional staff." J.A. at 196. On August 24, 1988, Peiffer extended Johnson's probationary period through December 7, 1988, in order to "make a conclusive judgment on [Johnson's] overall performance." Id . at 64-65. Peiffer told Johnson that members of his staff had complained about him and that he was so overly focused on process that his unit was not fulfilling its primary substantive duties. See, e.g., id. at 70, 75-80. This was but one of eight conversations between June 1 and September 27, 1988, in which Peiffer informed Johnson of the dissatisfaction with his performance.
 
 
 5
 According to Peiffer, it eventually became apparent that Johnson's performance was not improving and, indeed, was deteriorating. On November 2, 1988, Peiffer met with appellant and offered him the choice of termination or demotion to a non-supervisory position with an accompanying salary reduction. Johnson chose to remain with DBD in the non-supervisory position. Id. at 119-21.
 
 
 6
 In August 1989, appellant filed a claim with the Equal Employment Opportunity Commission, charging the state of Maryland with age and race discrimination and retaliation for comments he had made concerning an administrative decision by his supervisor. The EEOC dismissed the complaint on April 5, 1991, concluding that there was a lack of evidence to support Johnson's claims. Id. at 165.
 
 
 7
 Johnson thereafter brought this action against DEED and the state of Maryland in federal district court, alleging that his demotion was motivated by unlawful race discrimination and/or retaliation in violation of Title VII. After discovery, DEED and the state moved for summary judgment. The district court granted the motion, holding that Johnson "simply ha[d] not proven that but for the fact that he was African American, he would not have been demoted." Id. at 613-14. This appeal followed.
 
 II.
 A.
 
 8
 The Supreme Court has established a now-familiar scheme for resolving private, non-class action employment discrimination cases under Title VII. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). In the first stage of this burden-shifting scheme, the plaintiff must prove, by a preponderance of the evidence, a prima facie case of discrimination. Upon proof of a prima facie case, a rebuttable presumption that the defendant employer unlawfully discriminated against the plaintiff arises, Burdine, 450 U.S. at 252-54, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. at 253. Should the employer carry this burden, the prima facie case is rebutted, and the burden shifts to the plaintiff, who "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. This burden merges with the plaintiff's ultimate burden of persuading the trier of fact that he was the victim of intentional discrimination. The plaintiff may show pretext either directly through proof that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. Id . at 256; see also Monroe v. Burlington Indus., Inc., 784 F.2d 568 (4th Cir. 1986).
 
 
 9
 Summary judgment in favor of a Title VII defendant may be appropriate at either the first or third stages of the McDonnell Douglas/Burdine analysis if the plaintiff fails to offer sufficient evidence to meet his burdens. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005-06 (4th Cir.) (failure to establish prima facie case), cert. denied, 484 U.S. 897 (1987); Int'l Woodworkers of America v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1271 (4th Cir. 1981) (failure to produce evidence countering employer's articulated legitimate reason for disparate treatment). Whether a case is set for jury trial or, as in this instance, is scheduled for bench trial, however, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The issue on the basis of which the nonmoving party contends that he is entitled to trial need not be resolved conclusively in his favor; "rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Servs. Co., 391 U.S. 253, 288-89 (1968).
 
 B.
 
 10
 The district court found that Johnson made out a prima facie case that his demotion was discriminatorily motivated, see J.A. at 609-10,[1] and that the state and DEED rebutted Johnson's prima facie case by articulating legitimate, nondiscriminatory reasons for the demotion, namely, that under Johnson's management, "the Marketing Resources unit failed to produce the work required by its four primary functions" and that Johnson "failed to develop an effective working relationship with his professional staff." Id. at 610. The court concluded, however, that appellant failed to raise any genuine issues of material fact as to whether these asserted justifications were pretextual. We believe that the district court impermissibly weighed the evidence to Johnson's detriment in determining that Johnson had not satisfied his burden at this stage of the McDonnell Douglas/Burdine analysis. Considering the evidence in the light most favorable to Johnson, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986), Johnson proffered sufficient evidence at least to raise a material question of fact as to whether appellees' asserted reasons for his demotion were pretextual.
 
 
 11
 In support of their contention that "[Johnson's] overall performance was unsatisfactory," Appellees' Br. at 17, appellees rely almost exclusively on the affidavit and deposition testimony of James Peiffer, Johnson's supervisor, in which he recites and describes the alleged deficiencies in Johnson's performance upon which his evaluation of Johnson was based. For nearly every alleged deficiency in Johnson's performance identified by Peiffer and accepted as true by the district court, however, Johnson offered evidence flatly contradicting the factual premises upon which that alleged deficiency rested.
 
 
 12
 Peiffer, for example, initially claimed and the district court found that every member of Johnson's staff complained about his managerial style. J.A. at 172-73, 196, 228-29, 610. On cross-examination, however, Peiffer could recall only two of the five members of appellant's staff having complained to him about Johnson, id. at 548-49, which suggests that disgruntlement among Johnson's staffers, a key reason advanced for appellant's demotion, may not have been as widespread as appellees asserted and the court below believed.
 
 
 13
 The district court also found, as appellees' asserted, that the productivity of Johnson's unit was unsatisfactory during his term as manager. Once again, however, Johnson offered considerable evidence contradicting the underlying premises of appellees' assertions.
 
 
 14
 Peiffer, for instance, contended that Johnson's managerial ineffectiveness was evident in the failure of the Marketing Resources unit to provide adequate data support to DBD industrial representatives. Peiffer testified that representatives Gary Ventry, Roger Lukens, and Bob Barnes, and their manager, Herb Thweat, all had complained to him about this problem. Id. at 216-18. Johnson, however, presented evidence that Thweat categorically denied complaining to Peiffer or to others about Johnson or about the support provided to his representatives by the Marketing Resources unit, id. at 460, and that Lukens and Barnes each completed a survey immediately prior to Johnson's demotion reflecting that neither had experienced difficulties obtaining support from Johnson's staff. Id. at 303, 306.
 
 
 15
 Peiffer also testified that Johnson and his staff failed to organize and maintain DBD's business information library during his eightmonth tenure as manager, although he was specifically instructed to do so. The only progress Johnson made with respect to the library, contended Peiffer, was the production of a classification scheme that was so unnecessarily complex that it was unusable. Id. at 213-15. Here, too, Johnson offered evidence contradicting Peiffer's statements. He proffered Peiffer's cross-examination testimony that when Johnson became manager in March, 1988, the library was "in disarray," id. at 209, and evidence that only two months into his tenure, DBD moved its offices from Annapolis to Baltimore. He then presented documentary evidence that, after first finding the library in shambles and then conducting an arduous move, his staff did in fact reorganize the library, update its filing system, and order necessary publications. Id. at 275-98.
 
 
 16
 The district court also agreed with appellees' claims that, in addition to Johnson's poor staff relations, support of industrial representatives, and library maintenance, Johnson and his staff also failed to complete numerous specially assigned projects. Peiffer testified, for example, that Johnson produced neither a group of pamphlets known as the Brief Economic Facts nor an Overview Brochure, and that appellant had failed to update the Inventory of Major Locational Factors, a collection of socioeconomic data referred to as the "three-ring binder." Id. at 224. Once more, however, Johnson produced conflicting evidence which tended to show that, prior to his demotion, his unit completed the Brief Economic Facts, with the exception of certain wage data that had yet to be received from several Maryland counties, id. at 354, 438; that the Overview Brochure was left unfinished only because appellees never approved the expenditure of the $35,000 that the Brochure would cost, id. at 356; and that the threering binder was fully updated on time and on schedule. Id. at 307-53.
 
 
 17
 Because Johnson produced only one opportunity study, Peiffer also charged that Johnson had not identified enough industrial opportunities for DBD. On cross-examination, however, Peiffer admitted that Johnson's predecessor and his successor as Marketing Resources unit manager each produced only one study as well, although they managed the unit for longer periods than did appellant. Id. at 545-46.
 
 
 18
 Last, Peiffer represented that appellant's failure to complete six additional tasks that appeared on a list entitled"Incomplete Projects 9/1/88"-"New and Expanded List, Library, Hooker, Subscriptions, Opportunity Study, Prospect Support"-was another reason for Johnson's demotion. Id. at 435. But Johnson offered documentary evidence showing that the New and Expanded List was finished on October 11, 1988, id. at 436-37; that the Hooker project was not even assigned until October 5, 1988, and was promptly completed on October 15, 1988, id. at 439-40; that the Subscription List was finished during September, 1988, id. at 296; that he completed his opportunity study during October, 1988, id. at 376-433; and that, as discussed supra, he had substantially completed the reorganization of the library by October and that his "prospect support," another term for support of DBD industrial representatives, was at least adequate.[2]
 
 
 19
 In short, as to most if not all of the nondiscriminatory reasons for demoting Johnson articulated by appellees, Johnson offered substantial evidence that, if believed, would draw into question whether these asserted reasons were in fact the motivation for appellant's demotion. As the district court itself acknowledged, "[t]he parties argue about numerous issues and instances [of Johnson's managerial deficiencies], [appellees] contending that the instances are examples of [Johnson's] ineffectiveness as Manager and [Johnson] disputing [appellees'] conclusions and interpretations of those events," id. at 610. Summary judgment often may be warranted in cases where the employee against whom the adverse personnel action is taken challenges the existence or magnitude of the conduct that assertedly underlay the adverse action. On this particular record, however, given the nature and quality of the evidence proffered by appellant and its direct correlation to the alleged grounds for his demotion, summary judgment simply was inappropriate, see Liberty Lobby, 477 U.S. at 248-49, and a contrary conclusion could only have been reached by an impermissible weighing of the evidence. Johnson was not required "to prove that his demotion was racially motivated and that[appellees'] legitimate nondiscriminatory reasons were a pretext for discrimination." J.A. at 614 (emphasis added). He had only to identify genuine issues of material fact as to whether the asserted reasons for his demotion were pretextual. See Burdine, 450 U.S. at 256; Chesapeake Bay Plywood, 659 F.2d at 1271-72. This he did.
 
 III.
 
 20
 We express no view as to the ultimate merits of Johnson's suit. After it has had the opportunity at trial to hear testimony, observe the parties' witnesses, and fully evaluate all of the evidence, the district court may well conclude that the nondiscriminatory reasons for Johnson's demotion articulated by appellees were in fact the reasons for his demotion, and that appellant lost his managerial position not because of his race, but because he was a poor manager. On the evidence he proffered, however, Johnson is at least entitled to his day in court so that he can attempt to prove otherwise. The judgment of the district court is reversed and the case remanded for trial.[3]
 
 REVERSED AND REMANDED
 WIDENER, Circuit Judge, dissenting:
 
 21
 I respectfully dissent.
 
 
 22
 I would affirm on the thorough and well considered opinion of the district judge in Johnson v. State of Maryland, et al., CA-91-1884HAR.
 
 
 
 [1]
 In order to make out a prima facie case, Johnson was required to prove by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was qualified for his managerial position and his job performance was satisfactory; (3) in spite of his qualifications and performance, he was demoted; and (4) the position remained open to similarly qualified applicants after his demotion. Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989). Appellees do not seriously contest that Johnson carried his "not onerous" burden at this stage of the analysis, see Burdine, 450 U.S. at 253. They argue instead that summary judgment was appropriate because Johnson could not meet his ultimate burden at the third stage of proving that appellees' asserted reasons for the demotion were pretextual
 
 
 [2]
 Appellant also proffered undisputed evidence that his unit was substantially understaffed during his time as manager, but that the unit was assigned more duties than it had been either prior to or after Johnson's tenure. Although Peiffer claims to have taken the understaffing problem into account when deciding to demote Johnson, see id . at 200, this evidence tends to mitigate further appellees' charges that Johnson's staff did not complete its core duties
 
 
 [3]
 Johnson alleged both race discrimination and retaliation as causes of his demotion, and the parties briefed both issues below. Although it noted that Johnson had made the retaliation claim, see J.A. at 609, the district court granted summary judgment to appellees after discussing only the discrimination claim. On remand, the court should fully address each of Johnson's Title VII claims