Darzel ROBINSON, Individually and on behalf of a class of borrowers similarly situated

v.

FOUNTAINHEAD TITLE GROUP CORP., et al.

Civil No. WMN–03–3106.

United States District Court, D. Maryland.

March 26, 2008.

Order Denying Reconsideration, July 23, 2008.

Richard S. Gordon, Cory L. Zajdel, Quinn Gordon and Wolf Chtd., Towson, MD, Nevett Steele, Jr., Phillip R. Robinson, Civil Justice Inc, Baltimore, MD, for Darzel Robinson, Individually and on behalf of a class of borrowers similarly situated.

James Edward Dickerman, Alvin I. Frederick, Eccleston and Wolf PC, Hanover, MD, Jay N. Varon, Foley and Lardner LLP, Washington, DC, for Fountainhead Title Group Corp., et al.

### *MEMORANDUM*

WILLIAM M. NICKERSON, Senior District Judge.

Pending before the Court is the "Motion to Dismiss In Part Plaintiffs' Fourth Amended Complaint" filed by Defendants, Fountainhead Title Group Corporation (Fountainhead), Assurance Title, LLC (Assurance), Long & Foster Real Estate, Inc. (Long & Foster), and Mid–States Title Insurance Agency, Inc. (Mid–States), Paper No. 78, and the "Motion for Certification of the Class" filed by Plaintiff Darzel Robinson. Paper No. 87. Plaintiff also has moved to strike Defendants' joint opposition to the class certification motion, Paper No. 99, and to seal certain exhibits.[1] Papers No. 88 & 97. Fi-

---

1. The motions to seal assert that certain documents were provided to Plaintiff during discovery and were marked as "Confidential." Accordingly, Plaintiff alleges that each document "purportedly contains non-public and proprietary information" and therefore requests that each be sealed. Under the Local Rules, a party seeking to seal documents must provide the Court with "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections." L.R. 105.11. This Court has explained that "[c]haracterizing documents as 'confidential' without any explanation as to why the information should be protected does not satisfy the 'specific factual representations' that Local Rule 105.11 requires." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, Civ. No. DKC 2004–0174, 2006 WL 2583611 at *18 (D.Md. Sept. 7, 2006). Since Plaintiff has failed to comply with Local Rule 105.11, the Court will deny the motions to seal. The parties will have 15 days to file motions to seal in compliance with the Local Rules and, until such time, the papers temporarily under seal shall remain under seal. If the parties

nally, Defendants have moved for leave to file a sur-reply.[2] Paper No. 103. All of the motions are fully briefed and are ripe for decision. Upon a review of the pleadings and applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendants' partial motion to dismiss will be granted, that Plaintiff's motion for class certification will be granted as to part of the RESPA claim, but denied as to the state law claims, and that Plaintiff's motion to strike will be denied.

## I. FACTS AND PROCEEDINGS

Plaintiff, Darzel Robinson, initiated this putative class action alleging that she and a class of similarly situated homeowners were charged fees for title work through a sham entity as part of an illegal kickback scheme. She asserts that Defendants Fountainhead, Long & Foster and Mid–States established Defendant Assurance, a sham "affiliated business arrangement" (ABA), to facilitate the kickback scheme. Fourth Amended Comp. (FAC) ¶ 1. According to Robinson, Long & Foster had an agreement whereby it would refer title and closing work to Fountainhead. While Fountainhead and/or Mid–States (a wholly owned subsidiary of Long & Foster) actually performed the title and closing work, home purchasers were charged fees purportedly owed to Assurance for title work and these fees were in excess of the "customary and usual fee that Fountainhead was permitted to charge[.]" *Id.* at ¶ 4. Robinson alleges that a portion of the fees paid to Assurance were channeled back to Long & Foster and Mid–States by Fountainhead as a "reward" for the referral of the title and closing work. *Id.* Finally, Robinson alleges that the Defendants engaged in the same scheme in thousands of real estate transactions with the putative class members.

On January 18, 2006, Robinson filed her Third Amended Complaint (TAC)[3], alleging that Defendants violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607 (Count I) and the Maryland Consumer Protection Act (MCPA), Md.Code, Com. Law § 13–101 *et seq.* (Count II). She also brought state common law claims of negligent misrepresentation (Count III), fraud (Count IV), civil conspiracy (Count V) and restitution/unjust enrichment (Count VI). On August 9, 2006, this Court dismissed the MCPA claims as to all Defendants; dismissed the claims brought under § 8(b) of RESPA as to all Defendants; and dismissed the claims brought under § 8(a) of RESPA as to Long & Foster, Mid–States, and Assurance, but not as to Fountainhead. *Robinson I*, 447 F.Supp.2d 478. All of the state common law claims remained.

On May 14, 2007, Robinson filed her Fourth Amended Complaint, in which she realleged in identical form all of the causes of action set forth in the TAC, and added six new counts under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (Counts VII–XII).

## II. MOTION TO DISMISS

Defendants have moved to dismiss all of the RICO counts, as well as the counts already dismissed in this Court's prior opinion and order. Robinson does not oppose the latter request. Accordingly, as an initial matter, the Court will dismiss Count I as to all Defendants except that the claims under § 8(a) of RESPA remain as to Fountainhead, and will dismiss Count II (MCPA) in its entirety for all of the reasons explained in the prior memorandum opinion of this Court. To the extent that the prior opinion of this Court placed limits on other claims, those limitations also would remain in force.

### A. Standard of Law

To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations" are not

---

do not file motions to seal in that time, the papers will be unsealed.

**2.** The Court will deny the motion for leave to file a sur-reply. Many of the "new arguments" allegedly raised by Plaintiff in her Reply brief actually were raised in her opening brief. The remainder were raised in response to arguments raised by Defendants in their 75–page joint opposition.

The Court is not persuaded that additional briefing would be helpful at this time.

**3.** The extensive history of this case preceding the filing of the TAC is detailed in a prior memorandum opinion of this Court. *See Robinson v. Fountainhead Title Group Corp.*, 447 F.Supp.2d 478 (D.Md.2006) ("*Robinson I*")(dismissing in part the TAC) (Paper No. 51).

required, but a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' " and this "requires more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action[.]" *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, —— ——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (internal citations omitted). In considering such a motion, the court is required to accept as true all well-pled allegations in the Complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff. *See Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). A plaintiff must have alleged facts "to raise a right to relief above the speculative level[.]" *Twombly,* 127 S.Ct. at 1965. "[O]nce a claim has been stated adequately," however, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

### B. Discussion

RICO's civil provision provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964. Robinson alleges that Defendants violated Section 1962(a), (c), and (d) of RICO. Section 1962(a) provides, in pertinent part, that:

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" *Id.* at § 1962(c). Finally, Section 1962(d) makes it unlawful to conspire to violate Sections 1962(a) or (c).

Defendants contend that Robinson's RICO claims under Sections 1962(a) and (c) must be dismissed because she has failed to properly plead a pattern of racketeering activity or justifiable reliance on the predicate acts and has failed to properly allege the existence of a RICO "enterprise." Also, with respect to the Section 1962(a) claim, Defendants argue that Robinson has failed to provide sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure with respect to the pattern of racketeering activity from which Defendants derived the investment income. Finally, with respect to the Section 1962(d) claim, Defendants assert that, because the substantive RICO claims are deficient, the conspiracy claim also must fail.

To show a "pattern of racketeering activity," a plaintiff must "adequately plead at least two predicate acts of racketeering activity[.]" *Am. Chiropractic Assoc. Inc. v. Trigon Healthcare Inc.,* 367 F.3d 212, 233 (4th Cir.2004) (citing 18 U.S.C. § 1961(5)). Robinson has alleged that Defendants committed predicate acts falling into two categories: mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.[4] *See, e.g.,* FAC ¶ 160. *See also* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include mail and wire fraud). The elements of mail or wire fraud are "(1) a scheme disclosing an intent to defraud, and (2) the use, respectively, of the mails or interstate wires in furtherance of the scheme." *Am. Chiropractic,* 367 F.3d at 233.

■ Where the alleged RICO predicates are rooted in fraud, a plaintiff must comply with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Proce-

---

4. Robinson also alleges, in a conclusory fashion, that Defendants engaged in "[m]ultiple instances of interstate transport of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314." *See, e.g.,* FAC at ¶ 154(c). The Court will not consider this predicate act based merely on this bare assertion given that Robinson does

not explain how or when these interstate transports occurred. *See Kerby v. Mortgage Funding Corp.,* 992 F.Supp. 787, 798 n. 3 (D.Md.1998) (disregarding an alleged predicate act based on nothing more than a "bare allegation" of a violation).

dure. *See Choimbol v. Fairfield Resorts, Inc.*, 428 F.Supp.2d 437, 445 (E.D.Va.2006). Rule 9(b) provides, in pertinent part, that, "[i]n all averments of fraud . . . the circumstances constituting the fraud . . . shall be stated with particularity." Fed.R.Civ.P. 9(b). "In a RICO case, the 'circumstances constituting fraud' under Rule 9(b) refer to such matters as the time, place and contents of the false representations, as well as the identity of the person making the representation, and what [was] obtained thereby." *Lust v. Burke*, 876 F.Supp. 1474, 1480 (D.Md.1994)(internal quotation omitted)(alteration in original).

With respect to the predicate act of mail fraud, Robinson alleges that the Defendants "on numerous occasions" mailed "HUD-1 Settlement Statements, correspondence, other loan closing documents, and original copies of owner's title insurance policies that fraudulently misrepresented the relationship between [the] conspirators and concealed the true nature of services provided by the sham entity [Assurance.]" FAC ¶ 74. Specifically, Robinson alleges that, on February 11, 2004, she received a letter, dated December 12, 2003, purportedly sent by Assurance, but signed by a "Fountainhead and/or Mid-States['] employee, Stephan C. Oliver." *Id.* & Ex. 1. The letter contained Robinson's title insurance policy and "deceptively [hid] the fact that Assurance Title was a sham entity that was created to launder money back into the hands of Long & Foster, Mid-States, and Fountainhead." *Id.*

Robinson further alleges that a letter bearing the same date and also purportedly sent by Assurance was mailed to the lender in Robinson's transaction, Wells Fargo, and similarly was signed by an employee of Fountainhead and/or Mid-States. *Id.* at ¶ 75 & Ex. 2. Finally, Robinson alleges that similar mailings were sent to each member of the putative class in some 16,900 transactions and that Robinson and each class member relied on the "deceptive correspondence[.]" *Id.* at ¶ 76.

With respect to wire fraud, Robinson alleges that Defendants, "on thousands of occasions," "used and caused to be used telephone and other wire transmissions including, but not limited to emailing loan documents such as the HUD-1 Settlement Statements and fraudulent ABA disclosure forms . . . as well as the receipt and dissemination of funds through bank wire transfers in each and every Class members' transaction with the intent and in furtherance of the scheme to defraud." *Id.* at ¶ 77.

The mailings and wire communications "were intended and did assure" Robinson and the putative class that the processing of their mortgage and real estate closing was "proceeding legitimately and legally, and influenced [them] to accept the process[.]" *Id.* at ¶ 79. As a result of their reasonable reliance on the mailings and communications, neither Robinson nor any member of the putative class questioned the fees paid to Assurance or refused to pay the fees. *Id.*

■ To have standing to bring suit under RICO, a plaintiff must allege "that [s] he was injured 'by reason of' [a] pattern of racketeering activity." *Holland v. Cole Nat'l Corp.*, Civ. No. 04–246, 2005 WL 1242349 at *5 (W.D.Va. May 24, 2005) (citing *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.1996)). Thus, Robinson must "plausibly allege both that [she] detrimentally relied in some way on the fraudulent [materials] and that the fraudulent [materials were] a proximate cause of the alleged injury to [her] business or property." *Chisolm*, 95 F.3d at 337. *See also Am. Chiropractic*, 367 F.3d at 233–34 (finding that plaintiffs' allegations of mail and wire fraud were insufficient because they could not have justifiably relied upon the document allegedly mailed and wired).

■ In the instant case, Robinson alleges receiving several mailings and communications from Defendants that she relied upon to her detriment.[5] First, Robinson alleges that a HUD-1 Settlement Statement that "fraudulently misrepresented the relation-

---

5. Robinson also alleges that mailings were sent to her lender and that wire communications were exchanged between the Defendants. While these allegations may help support the existence

of a pattern of racketeering activity for purposes of RICO, Robinson and the members of the putative class obviously could not have relied upon these communications having never seen them.

ship between [the] conspirators and concealed the nature of the services provided by the sham entity" was mailed to her. FAC at ¶ 74. Defendants argue, based on the prior opinion of this Court, that Robinson could not have relied on the representations in the HUD–1 with respect to the nature of Assurance's services or fees as a matter of law. In dismissing in part Robinson's TAC, this Court opined that "[t]he Court finds that Plaintiff fails to allege that there was a misrepresentation in the HUD–1 form or that there was a duty to disclose the nature of the relationship of the parties *on that form.*" *Robinson,* 447 F.Supp.2d at 492 (emphasis added). Accordingly, this Court held that Robinson could not base her common law fraud or misrepresentation claims on the HUD–1. Robinson does not respond to Defendants' argument on this point. The Court agrees with Defendants that, for the reasons previously stated, the HUD–1 did not misrepresent the affiliations between the parties or the fees charged and, accordingly, Robinson could not have relied upon it to her detriment as a matter of law.

Next, Robinson alleges that Defendants emailed "fraudulent ABA disclosure forms" to her and other plaintiffs in the class and that these documents "contained fraudulent and false statements" and "concealed material facts[.]" FAC at ¶¶ 77–78. This Court concluded in its prior opinion in this matter that the ABA disclosure form supported Robinson's fraud and negligent misrepresentation claims in that Defendants were under a duty to disclose their business affiliations and the only form allegedly received by Robinson did not provide these disclosures. *Robinson I,* 447 F.Supp.2d at 491. In essence, it was the omission of disclosures from the form and Robinson's assertion that this

was the only ABA disclosure form she received that supported Robinson's claims, not the substance of the representations in the form. In fact, this Court emphasized that Robinson's allegations that the form misrepresented the services that would be provided by Assurance or the fact that she was not required to use Assurance's services were not supported by the ABA disclosure form. *Id.* at 491–92. This was so because the form did not mention Assurance and contained an express disclaimer that Robinson was free to choose her own title company. Finally, this Court noted that the form was "curiously" from Prosperity Mortgage Company (Prosperity), not one of the named Defendants in this case and stated that "there clearly is more going on in this case than that which has been explained in the pleadings. These issues should be made clear to the Court in future pleadings." *Id.* at 491 n. 6. Robinson's FAC does nothing to clear up this confusion.

The ABA form states on its face that it is "FROM: Prosperity Mortgage Company" and the form itself details Prosperity's business affiliations.[6] ABA disclosure form at 1 ("This is to give you notice that Prosperity [ ] has business relations with each of the companies described above."). While the Court has assumed for purposes of this motion that Robinson adequately alleges that the ABA disclosure form was sent through the wires[7], the omission of information from that form cannot itself be deemed wire or mail fraud as there was no obligation for the Defendants to provide the omitted information *via the wires or the mails.* If this Court were to conclude otherwise, any mailing or wire that did not include information that a plaintiff rightfully should have received could constitute mail or wire fraud based on a theory of fraud by omission.[8] Accordingly, given that this form

---

6. Documents that are relied upon by a plaintiff in the complaint properly may be considered on a motion to dismiss. *See, e.g., Am. Chiropractic,* 367 F.3d at 234 (noting that justification for this exception is that the plaintiff is on notice of the contents of the documents, having relied upon the documents in framing the complaint).

7. The Court notes that it is highly questionable whether Robinson alleges wire fraud with respect to the ABA disclosure form with adequate particularity under Rule 9(b) in that she does not allege when she was emailed the form or who

emailed it to her. This is information that would be in her control. Robinson also does not allege that the ABA disclosure form utilized the interstate wires, which is a requirement for wire fraud. *See, e.g., Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213, 227 (S.D.N.Y.1992) (offense of wire fraud requires "additional element of a communication crossing state lines").

8. The Court does not mean to suggest that, had the information on the form pertained to the named Defendants and been incomplete (*e.g.,*

states on its face that it was from Prosperity, not from a Defendant in this case, and given that it pertains only to Prosperity's business affiliations which are not the subject of the alleged fraudulent scheme, the Court concludes that Robinson has not plausibly alleged that the form is fraudulent with respect to the named Defendants or that she justifiably relied upon it to her detriment.

Finally, Robinson contends that the correspondence and copy of her title policy dated December 12, 2003, and received by her on February 11, 2004, was fraudulent and misleading because it was on Assurance letterhead, but was signed by an employee of Fountainhead and/or Mid–States. Defendants respond that, even assuming *arguendo* that this mailing was misleading, it was mailed to Robinson more than six months after her closing and was not received by her for more than seven months after her closing. Defendants thus argue that Robinson could not have relied upon this mailing to her detriment having already consummated the transaction and paid the allegedly illegal fees prior to receiving it.

Robinson responds by pointing to the Fourth Circuit's decision in *Chisolm*, arguing that it stands for the proposition that "general allegations" that defendants engaged in fraud and "took advantage of [ ] innocent plaintiffs' reliance on the apparent legitimacy and legality of the operation" are sufficient to plead reliance under RICO. Opp'n at 26 (quoting *Chisolm*, 95 F.3d at 339). *Chisolm* involved a revolving repossession scheme. After vehicles were repossessed from the plaintiffs, the defendants mailed them a "Notice of Private Sale" and gave them an opportunity to redeem their vehicle. Those vehicles that were not redeemed were not immediately resold, however, but rather were transferred to another defendant for a pre-set price much below fair market value. The defendants then initiated a deficiency suit against the plaintiff for the difference between the outstanding loan balance and the transfer price. Thereafter, the cars were resold, often at a profit,

without the plaintiffs' deficiencies being credited based on the subsequent sale. The plaintiffs brought a class action which included RICO claims alleging as a predicate that the "Notice of Private Sale" constituted mail fraud in that the transfer of the cars was not a "sale" under Virginia law. The plaintiffs failed to allege in their complaint, however, that they relied to their detriment on the notices. Based on the lack of an allegation of reliance, the district court dismissed the RICO counts and also denied the plaintiffs leave to amend the complaint to allege reliance, finding that amendment would be futile.

The Fourth Circuit reversed, holding that while the district court correctly dismissed the RICO counts for failure to plead reliance, it should not have denied the plaintiffs leave to amend because amendment would not be futile. In so holding, the court explained that, under the plaintiffs' theory of the case, the purpose of the mailed notices was to "assure [the plaintiffs] that the liquidation of the collateral was proceeding legally and legitimately, thus influencing them to accept the process without question, and depriving them of a meritorious defense to [the] deficiency suit." This was sufficient to state reliance under RICO according to the court.

Robinson's reliance on *Chisolm* is misplaced. In *Chisolm*, at the point in time that the mailings were sent to the plaintiffs, the repossessed vehicles had not yet been transferred and a deficiency suit had not yet been brought against the plaintiffs. In order for the repossession scheme to succeed, the plaintiffs had to rely on the legitimacy of the notices and not raise any questions about the purportedly legitimate sale of the vehicle. In the instant case, as noted earlier, the allegedly fraudulent scheme already was consummated by the time the title policies and attached correspondence were mailed out. To the extent that Robinson believed, as a result of the mailing, that the fees charged to her by Assurance were legitimate, this "reliance" did not further the fraud—which already was

---

omitted reference to Assurance), that this could *not support a claim of mail or wire fraud.* Here, however, the form does not pertain to the named

Defendants at all and one would not expect information on the form to disclose the business affiliations of the named Defendants.

complete—but rather delayed her discovery of it.

Having concluded that Robinson fails to plausibly allege that she justifiably relied to her detriment on any of the alleged mailings or wires, the RICO counts must be dismissed in their entirety.[9] Accordingly, the Court need not address Defendants' alternative arguments that Robinson fails to allege a pattern of racketeering activity or an enterprise for RICO purposes and that she fails to allege certain elements with adequate particularity.

## III. Motion to Certify Class [10]

Robinson seeks to certify a class consisting of:

All borrowers who entered into mortgage loan transactions using the services of Fountainhead Title where the HUD–1 Settlement Statement, or other document in the loan file, includes a charge for or payment to the Affiliated Business Arrangement Assurance Title for title, insurance or closing services.[11]

She seeks to certify the class for purposes of litigating all of her remaining causes of action: § 8(a) of RESPA against Fountainhead and negligent misrepresentation, fraud, civil conspiracy and unjust enrichment/restitution as to all of the Defendants.

### A. Standard of Law

■■■ Certification of a class action is governed by Rule 23 of the Federal Rules of Civil Procedure. In order to be certified, a class must satisfy all of the provisions of Rule 23(a) [12] and at least one of the provisions of Rule 23(b).[13] The proponent of cer-

---

**9.** A cause of action for conspiracy to violate RICO under 18 U.S.C. § 1962(d) "necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993); *See also Tuscano v. Tuscano,* 403 F.Supp.2d 214, 229 (E.D.N.Y. 2005) (same).

**10.** Robinson has moved to strike Defendants' joint opposition to the motion for class certification. Paper No. 99. She contends that the joint opposition relied upon documents improperly withheld from her during discovery in violation of Rules 16, 26, and 37 of the Federal Rules of Civil Procedure; that one exhibit to the joint opposition contained a chart summarizing records which violated Federal Rule of Evidence 1006; and that the two exhibits to the joint opposition were "rebuttal declarations" that violated the "sham issue of fact" rule. Mot. at ¶¶ 2–4. This motion will be denied.

With respect to the declarations and the chart summarizing records, the Court finds Robinson's contentions utterly without merit. In particular, the Court notes that Robinson does not direct the Court to any actual discrepancies between the declarations and the depositions to justify her contention that Defendants seek to create a sham issue of fact. She similarly cites no authority for the proposition that Rule 1006 applies at the class certification briefing stage.

With respect to Defendants' use of documents from class members' files, the Court is not persuaded that Defendants' were under an obligation to supplement disclosures given that the original objections to Robinson's discovery requests were based upon a contention that the requests were overbroad and Robinson did not challenge this response. The Court is troubled, however, by the fact that Defendants purported

to offer the Court a summary of the files to demonstrate that a significant sample of the putative class received an ABA disclosure form, but did not distinguish between those forms that include a disclosure about Assurance and those that do not. A brief review of these files reveals that a significant number contained forms that made no disclosure about Assurance. *See, e.g.,* Ex. 12.2 at MD644065. While these forms did disclose the business affiliation under Assurance's prior name, Mid–States Title Company—Baltimore, LLC, the HUD–1s show charges paid to Assurance.

**11.** Individuals who are or have ever been "executives of Defendants" are excluded from the class. Mot. at 1.

**12.** Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

**13.** For a class action to be maintained, one of the following conditions of Rule 23(b) must be satisfied:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or(B) adjudications with

tification carries the burden of showing that the requirements of Rule 23 have been satisfied. *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 64 (4th Cir.1977). In determining class certification, the Court will avoid an evaluation of the merits of the underlying claim, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), however, the Court may consider discovery directed to the certification issue. *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1267 (4th Cir. 1981). The Court has discretion in determining whether to certify a class and such a determination will be reviewed only for an abuse of that discretion. *Boley v. Brown,* 10 F.3d 218, 223 (4th Cir.1993).

### B. Discussion

Defendants assert that this action cannot be certified as a class action because Robinson fails to satisfy the typicality and adequacy requirements of Rule 23(a) and fails to satisfy any of the Rule 23(b) conditions.

### 1. The *Benway* case

This Court recently certified a class action in *Benway v. Resource Real Estate Services,* 239 F.R.D. 419 (D.Md.2006), a case presenting many similar factual and legal issues. In that case, the plaintiffs alleged that a real estate title and mortgage loan closing company, Resource, and a mortgage brokerage, Access One, established an ABA, Clipper City, to illegally extract referral fees from clients in violation of section 8(a) and 8(b) of RESPA. The plaintiffs also alleged that Resource had an interest in eleven other ABAs and executed the same scheme with those ABAs. The plaintiffs sought to certify a class of borrowers who entered into mortgage loan

transactions with Resource and paid a fee to any of the associated ABAs.

This Court concluded that the class as defined was too broad and that the plaintiffs were therefore not typical of the class under Rule 23(a)(3), but exercised its discretion to limit the class to those class members who paid a fee to the one ABA involved in the class representatives' transaction, Clipper City. With this limitation on the class, this Court found that it met the Rule 23(a) conditions and was certifiable under Rule 23(b)(3).

The instant case diverges from the *Benway* case in several respects. First, Robinson seeks to certify a class with respect to state common law claims as well as a RESPA claim. Second, the Defendants assert additional defenses not raised in the *Benway* case that they claim defeat predominance. Despite these differences, for the reasons that follow, the Court is persuaded that certification is appropriate at least as to portions of the RESPA claim.

### 2. RESPA and ABAs

The central contention upon which Robinson's RESPA claim rests, as was the case in *Benway,* is that Assurance was a "sham" ABA. Of course, this Court need not resolve this issue on the merits at this stage of the proceedings, but the means by which Robinson would seek to prove that Assurance is a "sham" ABA and whether liability would flow from that determination alone is relevant to certification.

Affiliated business relationships, or ABAs, are "real estate settlement service providers in which a person (such as a realtor) in a position to refer settlement services has an

respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only in-

dividual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

ownership interest." *Gardner v. First Am. Title Ins. Co.*, Civ. No. 00–2176, 2003 WL 221844 at *2 (D.Minn. Jan. 27, 2003) (citing 12 U.S.C. § 2702(7)). It is undisputed that Fountainhead, the lone remaining RESPA Defendant, and Mid–States, a wholly-owned subsidiary of Long & Foster, formed Assurance as a joint venture and that each had an ownership interest in Assurance. *See* Mot., Ex. 21 (Assurance's operating agreement indicating that Fountainhead has a 55% ownership interest and Mid–States a 45% interest). It is similarly undisputed that, as a matter of course, Long & Foster clients who were referred to Fountainhead for settlement services automatically were referred to Assurance for title work. *See* Opp'n at 22.

Robinson alleges that Fountainhead, through its affiliation with Assurance, violated section 8(a) of RESPA, which provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a). Under Section 8(c), RESPA provides five exemptions to the prohibitions of section 8(a). One of these exemptions pertains specifically to ABAs, providing that an ABA is not prohibited "so long as" it meets three conditions.[14] 12 U.S.C. § 2607(c)(4). As relevant to the instant case,

section 8(c) also exempts "the payment of a fee ... by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance ... [or] (2) the payment to any person of ... compensation or other payment for goods or facilities actually furnished or for services actually performed[.]" 12 U.S.C. § 2607(c)(1) & (2).

■ As this Court recently explained, "in order to be eligible for [the ABA] exception [ ], an ABA must be a 'bona fide provider of settlement services.' " *Benway*, 239 F.R.D. at 423 (quoting HUD Statement of Policy 1996–2, Regarding Sham Controlled Business Arrangements, 61 Fed.Reg. 29258, 29262 (June 7, 1996))("HUD SOP 1996–2"); *See also Gardner*, 2003 WL 221844 at *2 (noting that HUD has "read [the] requirement onto RESPA's statutory language" that an ABA must be a bona fide provider of settlement services in order to qualify for the section 8(c) exception). HUD has developed a 10–factor test to determine if an ABA is a "bona fide" or "sham" service provider.[15]

Robinson alleges that Assurance is a "sham" ABA because it is not actually a "provider of settlement services," but rather an entity set up for the sole purpose of allowing Fountainhead to channel referral fees back to Long & Foster/Mid–States. She argues that application of the HUD 10–factor test to Assurance would reveal it to be a sham entity.[16] Defendants respond that

---

Fed.R.Civ.P. 23(b).

**14.** The three conditions are:

(A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred ... (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship[.]

12 U.S.C. 2607(c).

**15.** The ten factors, as summarized by the *Gardner* Court, are:

(1) does the entity have sufficient initial capital and net worth; (2) is the entity staffed with its own employees; (3) does the entity manage its

own business affairs; (4) does the entity have a separate office; (5) are substantial services provided by the entity; (6) does the entity perform substantial services by itself; (7) if the entity contracts out services, are they from an independent company; (8) if the entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received; (9) is the new entity actively competing in the marketplace for business; and (10) is the entity sending business exclusively to one of the settlement providers that created it.

*Gardner*, 2003 WL 221844 at *2 n. 2 (citing HUD SOP 1996–2).

**16.** For example, Robinson alleges that Assurance had no employees, but rather used "leased" employees from Mid–States/Long & Foster; that Assurance's offices were located in Mid–States or

Assurance was a "bona fide provider of settlement services," but contend that, even if it was not, it still would not violate section 8(a) of RESPA if it qualifies for any of the other exemptions under section 8(c).[17] Robinson responds that an ABA that is not a "bona fide provider of settlement services" *per se* violates section 8(a) and is not eligible to defend under any of the other exemptions.

The two courts that have considered this issue have come to varying conclusions.[18] In *Gardner v. First American Title Ins. Co.*, 296 F.Supp.2d 1011, 1017 n. 7 (D.Minn.2003), the district court noted that "[b]ecause the section 8(c) exceptions are expressed in the disjunctive, a transaction between affiliated entities that does not satisfy the affiliated business arrangement exception may still avoid a RESPA violation by satisfying one of the other exceptions." The issue of whether any of the alternative exceptions applied, however, was not before the district court.

The District Court for the Northern District of Ohio reached the opposite conclusion in *Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268, 275 (N.D.Ohio 2006). That court explained that section 8(c) provides "safe harbors" for conduct otherwise violative of section 8(a). *Id.* With respect to ABAs, safe harbors are necessary "precisely because ABAs are by their nature likely to fall under the sweeping language of Section[ ] 8(a)[.]" *Id.* The court concluded that it followed that "a purported ABA that fails to meet the statutory requirements for an ABA violates Section 8." *Id.* The court explained:

> This conclusion is supported by Section 8(d)(3), which provides that "[n]o person or persons shall be liable for a violation of the provisions of subsection (c)(4)(A)" regarding disclosure of the ABA relationship if

certain requirements are met. 12 U.S.C. § 2607(d)(3).[19] The converse is that the statutory ABA requirements can be "violated" such that a person is "liable." HUD regulations are to the same effect. They explain that "[a]n affiliated business arrangement is not a violation of Section 8 of RESPA" only if the ABA requirements are met. 24 CFR § 3500.15(b).

*Id.* at 275–76.

■ This Court is persuaded by the reasoning of the *Pettrey* Court that an ABA that is not a "bona fide provider of settlement services" under the HUD 10–factor analysis or that fails to meet any of the three conditions set forth under Section 8(c)(4) is not otherwise eligible for the exemptions under section 8(c). This interpretation is further supported by the language preceding the ABA exemption, which states that "[n]othing in this section shall be construed as prohibiting ... (4) affiliated business arrangements *so long as* " the three enumerated conditions are met. 12 U.S.C. § 2607(c)(4)(emphasis added). The phrase "so long as" implies that, absent compliance with the enumerated conditions, an ABA would be prohibited. As the *Pettrey* Court emphasized, the regulations provide further support in that they state that an ABA does not violate RESPA or 24 C.F.R. § 3500.14.[20] "if" the conditions of section 8(c)(4) are met. 24 C.F.R. § 3500.15(b).

This interpretation also is in keeping with the purpose behind the 1983 amendments to RESPA which added the section 8(c)(4) exemption for ABAs (then known as "controlled business arrangements"). As one court has noted, "Congress amended RESPA to exempt [ABAs] from liability only in certain circumstances" because of the concern that

---

Fountainhead offices at all times; that Assurance did not market its services, relying instead on referrals from Fountainhead; that Assurance was inadequately capitalized at start-up; and that Assurance regularly contracted out certain title services to third parties. *See* Mot. at 19–20.

**17.** If, for example, Defendants could show that Assurance provided some settlement services in various class transactions, Fountainhead could defend that the fees it paid to Assurance were for "services actually performed" under section 8(c)(2). This would, of course, require a transac-

tion by transaction analysis to determine what services Assurance performed in each settlement and the fees it received for those services.

**18.** This issue was not directly raised before this Court in *Benway*.

**19.** Section 8(d)(3) pertains to "penalties for violations[.]"

**20.** 24 C.F.R. § 3500.14 contains the regulations interpreting sections 8(a) and (b) and the other RESPA exemptions.

the harm caused by ABAs was not limited to an increase in settlement costs, but extended to a lack of impartiality in referrals and a general decrease in competition in the settlement services market. *Kahrer v. Ameriquest Mortgage Co.*, 418 F.Supp.2d 748, 754–55 (W.D.Pa.2006). Thus, the harms caused by sham ABAs affect consumers generally and are not limited to transaction-specific overcharges or referral fees. *See Edwards v. First American Corp.*, 517 F.Supp.2d 1199, 1203–04 (C.D.Cal.2007) (discussing RESPA's legislative history and concluding that the 1983 amendments sought to address the situation where no direct referral fee was paid because of the existence of an ABA); *See also Robinson I*, 447 F.Supp.2d at 488 (concluding that plaintiffs need not prove an overcharge to prove a violation of section 8(a)). For this reason, the damages flowing from a violation of the ABA provision are not limited to the amount of any referral fee or the extent of an overcharge caused by the referral arrangement, but rather extend to all of the fees paid by the consumer to noncompliant ABAs. *See Kahrer*, 418 F.Supp.2d at 755.[21]

For all of these reasons, the Court concludes that an ABA must comply with the enumerated conditions of the section 8(c)(4) exception and the HUD 10–factor test in order to avoid a RESPA violation. The Court now will turn to the Rule 23(a) requirements for class certification.

### 3. Numerosity

"The numerosity requirement is satisfied when a class is too numerous to practicably join each individual class member." *Newsome v. Up–To–Date Laundry, Inc.*, 219 F.R.D. 356, 361 (D.Md.2004). Defendants do not dispute that the proposed class of between 5,000 and 16,900 [22] consumers easily satisfies the numerosity prong of Rule 23(a).

*See In re Kirschner Medical Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D.Md.1991) (noting that a class of more than 25 to 30 members "raises the presumption that joinder would be impracticable").

### 4. Commonality

Rule 23(a)(2) requires that Robinson show that there are "questions of law or fact common to the class[.]" Fed.R.Civ.P. 23(a)(2). A showing that class members share a single common issue of law or fact is sufficient to satisfy the commonality prong. *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 498 (D.Md.1998). Here, Defendants do not challenge that the putative class meets this threshold (choosing instead to argue that the common issues do not predominate under Rule 23(b)(3)) and the Court agrees that commonality is satisfied. The putative class shares common issues of fact in that each paid fees to Assurance and each closed their loan using Fountainhead's services. The legitimacy *vel non* of Assurance as an entity also is a question of law common to the class.

### 5. Typicality & Adequacy

The third and fourth conditions under Rule 23(a) are that the "claims or defenses of the representative parties are typical of the claims or defenses of the class" and that the "representative part[y] will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(3) & (4). " 'The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.' " *Broussard v. Meineke Dis. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir.1998) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir.1998)). "The test for determining typicality is whether the claim or defense arises from the same course of conduct leading to

---

**21.** The *Kahrer* Court quoted from the 1983 House Committee Report to this effect:

If the persons involved in [affiliated] business arrangements violate the conditions governing such arrangements, they shall be jointly and severally liable to the persons whose settlement service is involved in the amount of three times the amount of the charge paid for the settlement service plus court costs and reasonable attorneys' fees.

418 F.Supp.2d at 755 (quoting H.R.Rep. No. 98–123, 98th Cong., 1st Sess. at p. 77 (1983)).

**22.** The size of the class would vary with respect to different causes of action because of differing statutes of limitations. Robinson asserts that, even under RESPA's one year statute of limitations, the class would consist of "at least 5000" members. Mot. at 31 n. 21.

the class claims, and whether the same legal theory underlies the claims or defenses." *Peoples,* 179 F.R.D. at 498. *See also Twyman v. Rockville Hous. Auth.,* 99 F.R.D. 314, 321 (D.Md.1983)(quoting *Smith v. Baltimore & Ohio R.R. Co.,* 473 F.Supp. 572, 581 (D.Md.1979))("Factual differences will not necessarily render a claim atypical if the representative's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class, and is based on the same legal theory."). The focus of the adequacy inquiry is on the competency of class counsel, class counsel's willingness to prosecute the action and on whether any conflict of interest exists between the named parties and the class they represent. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

 Defendants contend that Robinson's claims are not typical of the class and that she will not adequately represent the interests of the class because she received an ABA disclosure form from Prosperity, while the majority of class members received an ABA disclosure form from Long & Foster. Opp'n at 70. Accordingly, Defendants contend that only those class members who "used Prosperity Mortgage as their lender, and received an incorrect disclosure from Prosperity and did not receive the Long & Foster disclosure would be similarly situated to Robinson." *Id.* The failure to receive the same disclosure form as other class members is not fatal to typicality or adequacy with respect to Robinson's RESPA claim, however. This is so because, as discussed *supra,* a proper disclosure is but one of the four statutory requirements to qualify for the ABA exception. Robinson's claim is premised on her allegation that Assurance was not a "bona fide provider of settlement services" under the HUD test. The determination of whether a particular ABA is a sham "does not require consideration of the specifics of an individual loan transaction." *Benway,* 239 F.R.D. at 424–25.

Defendants do not challenge class counsel's competency and this Court is satisfied that Robinson and her counsel will vigorously pursue this action on behalf of the class. *See* Richard S. Gordon Aff. Accordingly, with respect to the RESPA claim, typicality and adequacy are satisfied.

 Robinson's state law claims, however, present a much closer question. Both negligent misrepresentation and fraud claims require proof that the plaintiff justifiably relied upon a false statement or omission. *See, e.g., Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 916 A.2d 257, 273 (2007) (elements of negligent misrepresentation); *Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276, 292 (2005) (elements of fraud). As the Fourth Circuit has explained, " 'the reliance element of . . . fraud and negligent misrepresentation claims [is] not readily susceptible to class-wide proof;' rather, 'proof of reasonable reliance . . . depend[s] upon a fact-intensive inquiry into what information each [plaintiff] actually had.' " *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 435 (4th Cir.2003) (quoting *Broussard,* 155 F.3d at 341).

 As this Court discussed above and in *Robinson I,* the alleged fraudulent misrepresentation at the heart of Robinson's claim is one of omission: that the only ABA disclosure form received by Robinson did not disclose the then existing affiliated business arrangement between Fountainhead, Mid–States and Assurance. Robinson acknowledges that Long & Foster used a variety of ABA disclosure forms over the course of the class period. *See* Mot., Ex. 19 (attaching copies of numerous Long & Foster ABA disclosure forms). Some of these forms make no mention of Assurance, while others disclose the affiliated business relationship. Robinson argues that, since none of the forms disclose that Assurance is a sham ABA set up for the purpose of funneling kickbacks to Long & Foster and Mid–States, it is irrelevant which version of the form was received by each individual class member. That each form may have misrepresented the business affiliation, however, does not eliminate the problem of individualized proof of reliance on the specific misrepresentations contained in each class members' form. *See Pettrey,* 241 F.R.D. at 281 (concluding that proof that defendants operated a sham ABA in violation of RESPA, failed to disclose that fact, and that plaintiffs paid fees to that sham entity would not satisfy the reliance prong of a

negligent representation claim on a class-wide basis). The Court must conclude that Robinson's fraud and negligent misrepresentation claims are not typical of the class and that Robinson does not adequately represent the interests of the class with respect to these claims. It follows that Robinson's civil conspiracy claim also fails to meet this threshold.[23]

Finally, Robinson asserts a claim of restitution/unjust enrichment. A plaintiff must prove three elements to sustain a claim for unjust enrichment: "1. [a] benefit conferred upon the defendant by the plaintiff; 2.[a]n appreciation or knowledge by the defendant of the benefit; and 3.[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 936 A.2d 343, 351 (2007). A "restitution claim ... is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep." *Id.* at 352 (internal citation omitted). This claim is premised on Robinson's assertions that she and the class were overcharged for binder preparation by Assurance (in comparison to Fountainhead's rates) and that they were overcharged for title insurance—both by being charged for an enhanced, rather than standard, title insurance policy and by improperly being denied a reissue rate.

The Court is not persuaded that Robinson's claims are typical of the class, however. First, while Robinson received an ABA disclosure form that disclosed title insurance premiums of $3.50 per thousand, but was then charged $4.20 per thousand, many (if not most) class members apparently received an ABA form that disclosed the $4.20 rate. *See* Mot., Ex. 19 (copies of Long & Foster ABA forms); *See also* Opp'n, Ex. 12.2. Thus, to the extent that her argument is premised on improper disclosure of rates, Robinson's claim is not typical of the class. Moreover, since the higher rate was being charged for an enhanced policy, and since individual class members may have chosen to procure this enhanced policy as opposed to the standard policy, this claim would raise highly individualized issues with respect to whether it would be "inequitable for Defendants to retain the benefit."[24] Second, Robinson's argument with respect to the reissue rate, which is raised for the first time in her motion for class certification, would only be applicable to certain class members depending on the period of time between the issuance of the subject title insurance policy and a prior policy. *See Mitchell–Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551, 553–54 (D.Md.2006) (discussing the circumstances under which consumers are entitled to reissue rates). The Court is persuaded that there are sufficient variances between Robinson's claims and the claims of the class to defeat typicality as to this claim.

### 6. Rule 23(b)(3)

Having concluded that only Robinson's RESPA claim meets the Rule 23(a) threshold requirements, the Court must now determine if a class certified as to that claim is maintainable under one of the three conditions listed in Rule 23(b). *See Amchem Prods., Inc.,* 521 U.S. at 614, 117 S.Ct. 2231. Rule 23(b)(3) is the most appropriate category for certification and the Court need not address Robinson's arguments with respect to Rule 23(b)(1) & (2).

Under Rule 23(b)(3), the Court must find that common issues "predominate over any

---

**23.** This Court explained in *Robinson I,* that the civil conspiracy claim rises and falls with the other state law tort claims. 447 F.Supp.2d at 493 n. 7. Having declined to certify the fraud and negligent misrepresentation claims, the civil conspiracy claim, which is dependant on proof of these underlying torts, also cannot be certified. *See Pettrey,* 241 F.R.D. at 280 (declining to certify civil conspiracy claim after concluding that the underlying tort claims failed to satisfy Rule 23).

**24.** Contrary to Robinson's assertions, this is not a straightforward case of an overcharge as was presented in *Mitchell–Tracey,* a reissue rate class action. Unlike a reissue rate, which is a discount on the title insurance premium, the difference between the title insurance premium rates charged was actually based on differences between the coverage offered under the policies. Thus, the suggestion that all class members would have chosen the lower rate if it had been offered is without merit.

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). "Rule 23(b)(3) actions are particularly well-suited for cases in which small individual recoveries would not provide plaintiffs with enough incentive to prosecute separate actions." *Benway*, 239 F.R.D. at 426 (citing *Amchem Prods., Inc.*, 521 U.S. at 617, 117 S.Ct. 2231).

This Court concluded in *Benway* that a class could be maintained under Rule 23(b)(3) under similar factual and legal circumstances. *See Id.* at 426–27; *See also Id.* at 425 (rejecting the argument that plaintiffs would have to prove that each borrower was affirmatively influenced to use an ABA where the defendants had an existing referral arrangement). The Court adopts its reasoning as set forth in *Benway* except as follows.

In *Benway*, this Court noted that the defendants used "identical, standardized documents[.]" *Id.* at 426. In the instant case, at least with respect to the ABA disclosure forms, that clearly is not the case. While differentiations between the ABA forms would not be relevant to the inquiry into whether Assurance was a sham entity, should Robinson fail meet that threshold, it would be highly relevant in determining whether the ABA exception was met in individual class transactions.

■■■■ The potential for this individualized issue to arise in the course of litigation if the class was certified persuades the Court at this juncture to certify the RESPA claim only as to the issue of whether Assurance is a "bona fide provider of settlement services" under the HUD 10–factor test. *See* Fed. R.Civ.P. 23(c)(4) ("When appropriate, a class may be brought or maintained as a class action with respect to particular issues."). Should Robinson prevail on that issue, no further inquiry with respect to the ABA dis-

closures would be required. Should she fail to meet her burden with respect to that issue, the Court could entertain further briefing from the parties with respect to whether alleged violations of any of the three enumerated factors under section 8(c)(4) would be susceptible to class wide proof.

With this limitation in mind, the Court will address the Defendants' remaining arguments. Defendants contend that application of the HUD 10–factor test would present far more complex issues in this case than existed in *Benway*. This is so because Assurance operated for six years and during that time its management structure changed, its office location changed, and its manner of doing business changed. Opp'n at 46; *See also* HUD SOP 1996–2, 61 Fed.Reg. at 29262 (discussing 10–factor test). According to Defendants, because of these facts, the Court would be required to analyze Assurance under the HUD test at each stage of its existence, thus presenting the same problematic, individualized questions that caused this Court to narrow the class definition in *Benway* to include only one of the numerous ABAs. While, to be sure, discovery reveals variations in the way that Assurance conducted its business over the course of its six-year existence, the Court is not persuaded that these differences predominate over the common issues with respect to the HUD test.[25]

Finally, Defendants assert that the Court will need to determine on an individualized basis whether each loan was "federally related" within the meaning of RESPA. *See* 12 U.S.C. §§ 2602(1) and 2607(a). While this also would have been the case with respect to the *Benway* class, this argument was not raised. This argument reflects concerns about issues of management of the class. While the Court shares these concerns, it is persuaded by Robinson's assertion that this information would likely be readily obtainable from Defendants' computer database.[26]

**25.** For example, while Defendants are correct that Assurance changed office locations, it always was located in the same office as either Mid–States or Fountainhead. Similarly, while the management structure may have changed over time, all of the employees, including those in a management role, were either employed by

Mid–States/Long & Foster or were "leased" employees from Mid–States/Long & Foster. Defendants' argument that this "leasing" arrangement does not run afoul of RESPA goes to the merits of Robinson's claim.

**26.** The Court notes that almost any mortgage in a residential real estate transaction involving any

Reply at 25 n. 25. In any event, the Court will modify the class definition to include only those borrowers who entered into federally related mortgage loan transactions.

The Court will not repeat its analysis with respect to the superiority of a class action in a sham ABA case, but rather adopts the reasoning set forth in *Benway.*

## IV. CONCLUSION

For all of the above stated reasons, the Court grants Defendants' motion to dismiss and grants Plaintiff's motion for class certification only as to the limited issue of whether Assurance was a "sham" ABA or a "bona fide provider of settlement services" for RESPA purposes and denies certification of the remaining state law claims. The Court also denies Defendants' motion for leave to file a sur-reply, denies Plaintiff's motion to strike, and denies the motion to seal.

## *MEMORANDUM DENYING RECONSIDERATION*

Now pending before the Court is Defendant, Fountainhead Title Group Corporation's (Fountainhead), motion for reconsideration of this Court's partial grant of Plaintiff Darzel Robinson's motion for certification of a class. Paper No. 111. The majority of the arguments raised were fully considered and ultimately rejected by the Court in reaching its prior ruling. Accordingly, the Court will deny the motion. To the extent that Fountainhead raises new argument or authority, the Court will briefly address certain of these contentions.

The Court will not repeat the extensive factual and procedural history set forth in the prior decision certifying a class in this action. Briefly stated, however, Plaintiff initiated this putative class action alleging that Defendants Fountainhead, Long & Foster, and Mid–States established Defendant Assurance, a sham "affiliated business arrangement" (ABA), to facilitate a kickback scheme in violation of section 8(a) of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et seq.*[1] This Court certified a class under Rule 23(b)(3) as to the issue of whether Defendant Assurance was a bona-fide provider of settlement services or a sham ABA.[2] As this Court discussed, this issue can be decided on a class-wide basis by applying a ten-factor test promulgated by the Department of Housing and Urban Development (HUD). *See* HUD Statement of Policy 1996–2, Regarding Sham Controlled Business Arrangements, 61 Fed.Reg. 29258 (June 7, 1996)("HUD SOP 1996–2"). In this motion for reconsideration, Fountainhead challenges one of the underpinnings of this Court's analysis: that an ABA that is not in compliance with the three enumerated conditions of the ABA exemption set forth at 12 U.S.C. § 2607(c)(4) cannot otherwise defend under the other section 8(c) exemptions. Fountainhead also challenges this Court's conclusion that the need to determine whether class members' loans were "federally related" under RESPA would not destroy predominance.

"Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 514 (4th Cir.2003). Although this Court is therefore not bound by the standards set forth in Rules 59(e) and 60(b) in deciding this motion for reconsideration, it may use those standards as guideposts in determining

---

lender whose accounts are secured by the Federal Government or which is regulated by the Federal Government would qualify as "federally related." *See* 12 U.S.C. 2602(1). It seems likely that the majority of the loans otherwise meeting the class definition would meet these conditions as well.

1. Section 8(a) states:
 No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
 12 U.S.C. § 2607(a).

2. The Court denied certification as to all of Plaintiff's state law claims. Plaintiff's RESPA claim lies only against Fountainhead. *See Robinson v. Fountainhead Title Group Corp.,* 447 F.Supp.2d 478, 484 (D.Md.2006) (dismissing RESPA claims against other Defendants on statute of limitations grounds). ⎯⎯⎯⎯.

whether reconsideration is warranted. *See* Fed.R.Civ.P. 59(e) & 60(b); *see also Superior Bank, F.S.B. v. Tandem Nat'l Mortgage, Inc.*, 197 F.Supp.2d 298, 331–32 (D.Md.2000).

The Court begins by considering Fountainhead's contention that it is entitled to defend under two other exemptions to section 8(a) of RESPA.[3] This precise argument was raised by Fountainhead in its opposition to the motion for class certification and rejected by this Court. Fountainhead now has pointed this Court to HUD's comments on proposed regulations following the 1983 Amendments to RESPA which added the ABA exemption and which they argue cast doubt on this Court's conclusion.[4]

HUD first acted to promulgate a regulation implementing the ABA exemption in 1988. In discussing the ABA exemption (then known as the "controlled business association" or "CBA" exemption), HUD noted that it raised the question "are controlled business arrangements *per se* Section 8 violations unless all tests for the exemption are met (*i.e.*, is the new Section 8(c)(4) exemption merely a 'safe harbor' ensuring legality, or a statement of the only legal form of a controlled business arrangement)." 53 Fed.Reg. 17,424, 17,425 (May 16, 1988). HUD went on to opine:

> While the existence of a controlled business arrangement probably must raise the presumption of a Section 8 violation for the controlled business arrangement exemption to make sense, it is HUD's view that there is little legal or factual justification for viewing a controlled business arrange-

ment which fails to meet all elements of the new exemption as a *per se* Section 8 violation (*i.e.*, legal only if the elements of the new exemption are satisfied). Under that approach, no factual showing by either the provider of settlement services or incidental business or the owner of the provider could defeat the conclusions that, given any referral by the owner or an "associate" of the owner, a referral agreement exists and any dividend or similar return on ownership interests is a payment pursuant to that agreement.

*Id.* HUD proposed a version of 24 C.F.R. 3500.15 based on this interpretation that stated that payments made between ABAs and their participants in connection with federally related mortgage loans "presumptively" violated section 8 of RESPA if two conditions were met. *Id.* at 17,439. The first condition defined the class of persons who could receive a payment from an ABA to include, amongst others, real estate agents/brokers and title companies. The second condition was that the person receiving the payment had "referred business incident to or part of a settlement service to the person making the payment since the date of any previous payment which was presumptively made pursuant to an agreement for the referral of business[.]" *Id.*

Noticeably absent from HUD's discussion, however, is any mention of the other section 8(c) exemptions. Rather, HUD's concern appears to be whether an ABA that fails to satisfy the ABA exemption is a *per se* violation of section 8(a).[5] In other words, wheth-

---

**3.** Fountainhead first argues that it should be able to defend under Section 8(c)(1)(B) of RESPA, which provides an exemption for "payment of a fee … by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance[.]" It is not clear to the Court how this exemption could be applicable to Fountainhead under the facts of this case as alleged. Second, it argues that the Section 8(c)(2) exemption, exempting fees paid "to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed" (goods and services exemption), is potentially applicable.

**4.** Fountainhead does not explain why it did not include this information within its opposition to the motion for class certification.

**5.** Contrary to Fountainhead's assertions, the Court did not conclude that failure to comply with the ABA exemption or HUD's 10-factor test constituted a *per se* violation of RESPA. Rather, it merely concluded that the other section 8(c) exemptions were unavailable to ABAs. This is evidenced by the fact that the Court understood that the requirement under section 8(a) that a referral arrangement exist remained a requirement for liability. *See* Mar. 26, 2008 Mem. Op. at 35–36 (citing to *Benway v. Resource Real Estate Servs., LLC*, 239 F.R.D. 419, 425 (D.Md. 2006), for the proposition that a plaintiff need not prove that each class member was affirmatively influenced to choose an ABA so long as the class could show that a referral arrangement existed under section 8(a)). As this Court noted in *Benway*, this could be proved on a class-wide basis.

er an ABA that does not comply with section 8(c)(4) necessarily has an "agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). This is why, in rejecting an explicit presumption of a violation based on a non-compliant ABA, HUD opines that such a presumption would prevent an ABA from showing that no such referral arrangement exists and why the proposed regulation created a presumption if two conditions are met, both of which ensure that an actual referral arrangement exists.

More than 4 years later, HUD promulgated its final regulation codifying the ABA exemption. Absent from the final rule was the language that there was a "presumption" of a RESPA violation under certain circumstances. *See* 57 Fed.Reg. 49,600 (Nov. 2, 1992). HUD explained that several commenters had taken issue with this language. Instead, HUD chose to promulgate a rule that "simply state[d] that controlled business arrangements do not violate Section 8 of RESPA if the conditions provided in § 3500.15(b) are met." Again, there was no mention in the discussion of the rule of the other section 8(c) exemptions.

The only place where the other section 8(c) exemptions implicitly are mentioned in relation to the ABA exemption actually appears within the exemption itself. As discussed in this Court's prior opinion, the exemption contains three conditions all of which must be satisfied in order for an ABA to fall within the exemption.[6] The first is that the ABA relationship be disclosed to the referred party no later than the time of the referral. The second condition is that the referred party not be required to use the settlement provider. The third condition is that the "only thing of value that is received from the arrangement, *other than the payments permitted under this subsection,* is a return on the ownership interest or franchise relation-

ship[.]" 12 U.S.C. § 2607(8)(c)(4)(C). Fountainhead points to this language for the first time as supporting their argument that the other 8(c) exemptions are applicable to ABAs.

The Court is not persuaded, however, that this language supports Fountainhead's reading. By including this language only within the third prong of the ABA exemption, the natural reading is that the other 8(c) exemptions are relevant only to this prong of the ABA exemption. In other words, if a party failed to disclose its affiliate relationship or required a referred party to use a particular settlement service provider with which it had an affiliate relationship, it would not fall within the ABA exemption without regard to the third prong, and by implication, the other 8(c) exemptions. On the other hand, if an ABA complied with the first two prongs, but in addition to the return on ownership interest inherent in ABA arrangements, other "things of value" also were exchanged, this fact would not disqualify an ABA from the exemption so long as those payments were otherwise exempted under section 8(c). *See* HUD SOP 1996–2 at 29262 (noting that the third prong of the exemption "provides that the only thing of value that comes from the arrangement, *other than permissible payments for services rendered,* is a return on an ownership interest or franchise relationship") (emphasis added).

Thus, whether or not Fountainhead may utilize the section 8(c)(2) goods and services exemption depends upon whether or not Robinson can show on a class wide basis that Assurance was a sham ABA and/or that Assurance otherwise violated the first two prongs of the ABA exemption.[7] If Robinson fails in this regard, the goods and services exemption could be relevant to this Court's inquiry as to whether Fountainhead otherwise complied with the ABA exemption.

The Court now turns to Fountainhead's argument that the determination of whether

---

**6.** In addition to these three conditions, an ABA also must be a bona fide provider of settlement services, rather than a sham, pursuant to HUD's Statement of Policy.

**7.** The Court did not certify the issue of whether the three prongs of the ABA exemption were satisfied, choosing to defer that issue until after the issue of whether Assurance was a sham ABA was resolved. *See* March 26, 2008, Mem. Op. at 36.

each class member's loan is "federally related" under RESPA would require individualized inquiry, destroying predominance under Rule 23(b)(3). Again, this same argument was previously raised and rejected by this Court.[8]

The only Court to fully address this issue concluded, albeit in *dicta*, that the issue of whether loans were "federally related" under RESPA would not destroy predominance.[9] *See Busby v. JRHBW Realty, Inc.*, Civ. No. 2:04–CV–2799–VEH, 2006 WL 5325733, at *12 (N.D.Ala. July 20, 2006), *aff'd in part, rev'd in part on other grounds*, 513 F.3d 1314 (11th Cir.2008). The *Busby* Court opined with respect to this issue that it was "confident that had this case been appropriate for a class action, the Court with the assistance of counsel could fashion an appropriate method to determine whether the individual loans were federally related without creating the need for individual analysis such that predominance would be [a]ffected."[10] *Id.* This Court was similarly persuaded in the instant case by Plaintiff's assertion that, for the most part, information obtainable from Defendants' computer database would determine which loans were "federally related." This is so because, as Fountainhead acknowledges, the database will reveal the name of the lender in each transaction and any residential loan involving a lender regulated by federal banking agencies is presumptively "federally related" under RESPA. *See* Mot. at 20 (noting that "some loans will plainly be federally related because their lender can easily be determined to be regulated by federal banking agencies"); *see also* 12 U.S.C. § 2602(1). While Fountainhead is correct that the RESPA regulations provide certain

exemptions that might be applicable to some loans, *see* 24 C.F.R. § 3500.5, the Court is not persuaded that these issues are significant enough to defeat predominance.

The issue of liability—*i.e.,* whether Fountainhead violated section 8(a) of RESPA—is the core issue that may be resolved on a class-wide basis if the Plaintiff can prove that Assurance was a sham ABA. Whether or not each class member is entitled to damages under RESPA may turn in part on a determination as to whether they have a "federally related" loan.[11] As the Seventh Circuit Court of Appeals has noted, "[o]ften … there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.2004); *see also Gunnells v. Healthplan Servs. Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) (individualized inquiry into causation with respect to individual class members would not defeat predominance). This is why Rule 23 "allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Id.* This is precisely the type of issue that "imaginative solutions" should be able to resolve if liability has been determined to exist.

For all of the above stated reasons, the motion for reconsideration will be denied. A separate order shall issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 23rd day of July, 2008, by the

---

8. Fountainhead also reframes this argument as one going to issue of whether the class can feasibly be identified. A motion for reconsideration is not the vehicle to raise new arguments that could have been raised previously, however.

9. While the *Pettrey* Court mentioned this issue (as one of many) in deciding not to certify a RESPA class, it did not discuss its reasoning and suggested that the real issue involved the class definition as worded. *See Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268, 275 (N.D.Ohio 2006).

10. The *Busby* Court denied a motion to certify a class under section 8(b) of RESPA. On appeal, the Eleventh Circuit reversed in part, holding

that the district court applied the wrong legal standard in analyzing the plaintiff's claims and, accordingly, erred in not certifying the class under Rule 23(b)(3). The Eleventh Circuit made no mention of the issue of whether loans were federally related in deciding the case.

11. The Court notes that RESPA covers "almost every loan secured by a lien on residential real property in the United States designed principally for one- to four-family residency" and covers "almost every mortgage lender." James H. Pannabecker and David McF. Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* § 4–1(A) (2007).

United States District Court for the District of Maryland, hereby ORDERED:

1. That Defendant Fountainhead Title Group Corporation's motion for reconsideration, Paper No. 111, is DENIED; and

2. That the Clerk of the Court shall transmit copies of the accompanying Memorandum and this Order to all counsel of record.